## WILLIAM H. WOOD et al. vs. WILLIAM A. HAMMOND et als.

A testator desired so much of his realty to be sold as was needful to pay certain legacies, and then appointed executors, and requested them to use their best judgment about the time of selling the property. A part of the realty was subject to a mortgage.

*Held*, that the executors should pay the mortgage, exhausting the personalty before resorting to the realty.

*Held*, further, that the executors had power under the will to sell realty at public or private sale for the purpose of paying legacies.

*Held*, further, that the executors, to sell realty for the payment of debts, should obtain leave to sell from the proper probate court.

If the personalty of an estate is manifestly insufficient to pay debts, it is not needful that the personalty be exhausted, nor that the estate be represented insolvent before leave to sell realty for the payment of debts is given to the executors by the probate court.

The testator appointed his executors "trustees under this my will and testament over all trusts created."

*Held*, that the executors were trustees only in devises and bequests where the words "in trust" were expressly used, and that the executors might pay over other bequests without being responsible for the application of them by the donees.

Interest on legacies begins to run at the end of one year from the testator's death.

When an executor's bill for instructions has become by the pleadings an administration suit, the court will at its discretion either take the estate from the hands of the executors and administer it through its own officers, or administer it through the executors, giving them instructions and leaving them to account to the probate court.

In this suit the latter course was adopted, this court not acting as "handmaid" to the probate court, but using the probate court as its own "handmaid."

A testator by the first clause of his will directed the sale of so much of his realty as might be "necessary to pay the following legacies." A codicil to the will changed some of the legacies given in the will and added others. The estate being insufficient to pay all legacies in full:

*Held*, that the pecuniary legacies of the codicil should be paid on the same footing as the pecuniary legacies of the will proper.

A legacy was given to "The Nursery." There being when the will was written no corporation having the corporate name of "The Nursery":

*Held*, in the circumstances shown, and on the evidence adduced, that the legacy should go to the St. Mary's Orphanage for the benefit of the nursery maintained by it.

Evidence was offered to support a claim to this legacy made by another incorporated institution, neither known as The Nursery, nor, properly speaking, a nursery.

*Held*, that the evidence was inadmissible, and, if admissible, was in the circumstances inconclusive.

A corporation whose power to hold property is limited by its charter cannot, as devisee or legatee, take or hold in excess of its limit.

A testator devised his mansion house, with ten acres of land adjoining, to be selected by his executors, and $50,000 to the S. Corporation, for certain purposes. If the purposes were discontinued, or the gift not accepted, the testamentary gift was to go to the B. Corporation.

*Held*, that the S. Corporation could take only so much of the gift as would carry its property held at the testator's death to its charter limit; the amount of its property to be computed by taking the excess of its property held over and above its debts.

*Held*, further, that the rest of this gift went to the B. Corporation.

*Held*, further, that the realty of this gift was a specific devise not subject to abatement.

*Held*, further, that the legacy of $50,000 should abate with the other legacies, as the estate was insufficient to pay all in full.

*Held*, further, that the selection by the executors was an exercise of powers properly but not necessarily to be made by an instrument under seal. Such instrument should recite the clause of the will, state the executors' action, and define the selected land.

A testator made several pecuniary bequests in trust for life with remainders over, and his estate was insufficient to pay all his legacies in full :

*Held*, that, as between life tenants and remainder men, the legacies should abate proportionally. Until the legacies are set apart, the life tenants take their proportional share of the net income of the estate, *i. e.* of the income less taxes and interest on any debts of the estate remainining unpaid.

BILL IN EQUITY for instructions.

The will of Daniel Wanton Lyman, proven before the Court of Probate of the town of North Providence, January 19, 1887, is as follows :

" In the name of the Creator and Preserver of all things. Amen.

" I, Daniel Wanton Lyman, of the town of North Providence, County of Providence, State of Rhode Island, being fully aware of the uncertainty of life, and being of sound and disposing mind, do make this my last will and testament, revoking all other wills heretofore by me made. I desire so much of the real estate that I may die seized and possessed of as may be necessary to pay the following legacies to be sold, and from the proceeds of such sale the following legacies paid to the following persons and institutions and societies, to wit, viz.:

" To my Agent, William H. Wood, of the City of Providence, ten thousand ($10,000) dollars, if he be living at the time of my decease ; if not living at that time, to be divided equally between his children.

" To Julia L. Aborn, my cousin, ten thousand ($10,000) dollars, if she be living ; if not, to her children or child surviving her

at the time of my decease, share and share alike, and if no child be living, to revert to my estate.

"To Sophia T. Aborn, Louise L. Peck, and Annie B. Tillinghast, children of the said Julia L. Aborn, ten thousand ($10,000) dollars each, in trust for their natural lives, the income from said Trust Estate to be for their own free use and disposal, and at their death, or at the death of either of said children of Julia L. Aborn, such child's share to be divided equally among the children of Sophia T. Aborn, Louise L. Peck, and Annie B. Tillinghast.

"To George R. Dyer, son of Elisha Dyer, Jr., ten thousand ($10,000) dollars, for his own free use and disposal.

"To Anna Jones Dyer and Harriet Hoppin Dyer, twin children of William Jones Dyer, five thousand ($5,000) dollars each, for their own free use and disposal.

"To Caroline Lyman Peck, daughter of Walter A. and Louise L. Peck, twenty-five thousand ($25,000) dollars, in trust for her natural life, the income from said Trust Estate to be for her own free use and disposal, and at her death to her child or children, for its or their free use and disposal forever. If she die leaving no child or children, then said twenty-five thousand dollars to be given to the Society for the Prevention of Cruelty to Children without reservation.

"To Walter I. Barnes, Georgianna Barnes, and Sarah D. Barnes, children of Lydia Dyer Barnes, five thousand ($5,000) dollars each, for their own free use and disposal.

"To Louis Winsor, Benjamin Winsor, and Sarah S. Winsor, five thousand ($5,000) dollars each, for their own free use and disposal.

"To Charles W. Simmons, Walter Cook Simmons, Amory C. Sampson, and James A. Warren, five thousand ($5,000) dollars each, for their own free use and disposal, in memory of my pleasant relations with them.

"I give and bequeath my Cottage house and one acre of land to George W. Smail, for his kindness to my mother; said house and land are on Metcalf Avenue, in the town of North Providence.

"To Daniel Shay, my faithful farmer, one thousand ($1,000) dollars.

" To each person (male or female) in my employ as servant, or as farm hand, or coachman or groom, in my employ at the time of my decease, five hundred ($500) dollars.

" To the Society for the Prevention of Cruelty to Children of the City of Providence my Mansion House and buildings thereto belonging, situate in the Town of North Providence, on Fruit Hill Avenue, so called, and Ten (10) acres of land adjoining the same (as my Executors may select) ; also, fifty thousand ($50,000) dollars as a fund for the same ; said Real Estate and money to be forever used as a home and fund for the maintenance of said home for said children, and if not accepted or ever discontinued, to revert to Brown University as a ' Poor Student's Fund,' to be used as the Trustees and Corporation of Brown University may determine for that purpose, said fund to be called the ' Daniel Wanton Lyman Fund for Students.'

" To Edward Wheaton Hoppin, son of William Anthony Hoppin, I give and bequeath ten thousand ($10,000) dollars, in memory of his father's and mother's kindness to me.

" To Swan Point Cemetery Corporation three thousand ($3,000) dollars, as a fund for the perpetual care of the Lyman lots in said burial grounds, viz. : Daniel Lyman's, John W. Lyman's, and Daniel Wanton Lyman's Lots ; the interest of said fund to be used for caring for the monuments, grounds, and general appearance of said lots.

" I give and bequeath to the Corporation of Brown University, of the City of Providence, fifty thousand ($50,000) dollars, to build a building for any needed use they may elect (not sectarian) in memory of my Family, and said building to be known as the ' Lyman Memorial.'

" To my good friends, Elisha Dyer, Jr., William A. Hoppin, Asa Bird Gardner, and James M. Varnum (the last two of New York) ten thousand (10,000) dollars each, for their own free use and disposal.

" To the Town of North Providence, five thousand ($5,000) dollars, to erect a monument to the memory of the soldiers and sailors who fell or died in the late war, enlisting from this part of the town, existing A. D. 1885, and my desire is that the monument be erected at the junction of Olney and Fruit Hill Avenues of said town, on a triangular piece of land thereat located.

" To the ' Lying-in Hospital,' of the City of Providence, I give and bequeath in memory of my devoted mother, Caroline Lyman, twenty-five thousand ($25,000) dollars, as a fund for that worthy institution.

" To The Nursery I give five thousand ($5,000) dollars.

" To the City of Providence I give and bequeath ten thousand ($10,000) dollars, for the erection of a monument in Roger Williams Park, to be called the ' Elisha Dyer Memorial,' erected by his grandson, Daniel Wanton Lyman.

" I request all my just debts and funeral expenses to be paid, and my body interred in Swan Point Cemetery, in the place prepared for the same, beside the remains of my devoted mother, Caroline, wife of Henry Bull Lyman.

" I appoint as Executors of this my last will and testament William H. Wood, William A. Hoppin, and Esther D. Chapin, requesting them to use their best judgment about the time for selling the property, and direct the entire property be kept together for one year after my death, and the income, from whatever source, after necessary expenses, taxes, and so forth are deducted, to be divided equally between them as and for their salary or fee for being my Executors.

" I give to my dear cousin, Esther D. Chapin, all the residue of my property, both real and personal, remaining after paying all legacies, expenses, etc., and hereby make her my residuary legatee : which property so given I give in trust to Esther D. Chapin for her lifetime, she to have and enjoy all the income from said property for her own sole use and purposes, and at the death of said Esther D. Chapin, one half to go to her child or children, and the other half to go to Brown University. In case she leave no child or children, then her half to be, or the half her child or children would have had, to be divided equally between the Rhode Island Historical Society and the Rhode Island State Society for the Prevention of Cruelty to Animals.

" I appoint William H. Wood and William A. Hoppin Trustees, under this my will and testament, over all trusts created, they to pay all incomes over to those who have been given money in trust (or property), after deducting a reasonable compensation for their services as Trustees.

" I request that no sureties be required on any bond, and that no inventory be taken of my property, having full and explicit confidence in the Executors herein named.

" In Witness whereof, I have hereunto set my hand and seal this fourteenth day of July A. D. 1885.

"DANIEL WANTON LYMAN.  [L. S.]

" The foregoing instrument was at the date thereof signed and subscribed to, sealed, published, and declared, by the said Daniel Wanton Lyman, as and for his last will and testament, in the presence of us and each of us, who at his request and in his presence, and in the presence of each other, have hereunto subscribed and signed our names as witnesses, and do hereby attest the same the day and year above written.

"SPENCER B. HOPKINS.
" WILLIAM A. LEY.

" CODICIL.

" Whereas, owing to certain changes in human affairs, which affect more or less the foregoing instrument, I do hereby make this my codicil to my will and testament, as follows : In the above written will I have given to George W. Smail (for his attention and kindness to my mother) my Cottage house and lot on Metcalf Avenue in the town of North Providence ; now the said George W. Smail having acted towards me in a very unworthy and un-called for manner since my mother's decease, I hereby revoke said gift of said Cottage house and lot on Metcalf Avenue to said George W. Smail, and direct that the same Cottage house and lot on Metcalf Avenue be given to Bernard Campbell, my mother's former coachman and servant, to his own free use and for his disposal forever.

" Furthermore, whereas, by my will I have given the sum of ten thousand ($10,000) dollars to Julia L. Aborn with certain qualifications, and the said Julia L. Aborn now being dead, I revoke the said gift to her and hers, and direct my Executors to divide the said sum of ten thousand dollars in three (3) portions, as follows : One portion of five thousand ($5,000) dollars one portion of twenty-five hundred ($2,500) dollars, and another of twenty-five hundred ($2,500) dollars ; and to give the first portion of five thousand ($5,000) dollars to Henry A. Peters, of

Kingsey Falls, Canada, if he be living at the time of my decease, in memory of the high esteem I bear him and his devotion to me; the second portion of twenty-five hundred ($2,500) dollars to my young friend, Louis A. Treadwell, of Redding, Conn.; the third portion to William A. Malone, of Appling, Ga., for their own free use and disposal.

" I furthermore give and bequeath to Amory Chapin, son of Frances J. Chapin, the sum of ten thousand ($10,000) dollars, for his own free use and disposal forever.

" To my cousin, Frances Jones Chapin, daughter of my Aunt Frances Jones Vinton, twenty-five thousand ($25,000) dollars, in trust, the income of which shall be paid to her quarterly by my trustees during her natural life, and at her death to be given to Brown University, as a fund for the education of poor students in that University, to be called the Lyman Fund for Students.

            " DANIEL WANTON LYMAN.    [L. S.]

" The foregoing codicil to my last will and testament was, this eighteenth day of September, 1886, signed and subscribed to, sealed and published, and declared by the said Daniel W. Lyman as and for his last will and testament, in the presence of us and each of us, who at his request and in his presence, and in the presence of each other, have hereunto subscribed and signed our names as witnesses, and do hereby attest the same, the day and year above written, viz., Sept. 18, 1886.

                  " WILLIAM A. LEY,

                  " JOHN B. GOODWIN."

Letters testamentary on this will issued to William H. Wood and William A. Hoppin pursuant to an order of this court, *Hammond* v. *Wood*, 15 R. I. 566–570.

Wood and Hoppin, the complainants in this suit, then filed this bill asking for an interpretation of the will and for instructions.

The bill states that all parties claiming to be interested under the will are made respondents. The nature of the questions submitted sufficiently appears from the opinion of the court.

One of the testator's estates, called the " Musee Estate," had been mortgaged by him for $50,000.

*January* 28, 1888. PER CURIAM. In compliance with the request of the complainants, we will decide immediately the ques-

tions which have been submitted to us, leaving others for future decision.

We think that the complainants, in their capacity as executors of the will and codicil of the late Daniel W. Lyman, have power to sell so much of the real estate left by him as will be necessary to pay the legacies given by said will and codicil. The will opens with the following language : " I desire so much of the real estate that I may die seized and possessed of as may be necessary to pay the following legacies to be sold, and from the proceeds of such sale the following legacies paid to the following persons and institutions and societies, to wit." The will near its conclusion contains the following, to wit : " I appoint as executors of this my last will and testament William H. Wood, William A. Hoppin, and Esther D. Chapin, requesting them to use their best judgment about the time for selling the property." The latter clause, especially when taken in connection with the former, necessarily imports, in our opinion, that the executors as such are to sell the real estate in execution of the will, using their best judgment about the time of selling. And see 3 Redfield on Wills, *124. We also think that they have power to sell either at public or private sale, as they deem best, the power given being without restriction.

We are of the opinion that it is the duty of the complainants to pay the mortgage debt of $50,000, exhausting the personal assets before resorting to the real estate. In case of a resort to the real estate, they will have to obtain leave to sell from the Court of Probate, the power to sell given by the will being only to sell for the payment of the legacies. We know of nothing in the statutes which requires that they shall represent the estate as insolvent before applying for or before obtaining leave to sell where the insufficiency of the personal estate to pay the debts is clear.

We are of the opinion that, under the clause by which the testator appoints the complainants trustees under his will over all trusts created by it, " they to pay all incomes over to those who have been given money in trust (or property) after deducting a reasonable compensation for their services," the complainants are only made trustees so far as they are made trustees over those

devises and bequests where the words "in trust" are expressly used, and that they may pay over or deliver the property or money covered by all other bequests, including the property and money to be paid to corporations for certain specified purposes, without being obliged to see to the application thereof.

We think that interest will begin to run on the legacies at the end of one year after the death of the testator, unless some other time is appointed by the will for their payment. This is the general rule, and we find nothing in the will to prevent its application. *Decree accordingly.*

June 11, 1888, the Court of Probate of the town of North Providence, on the application of the complainants, made a decree authorizing them to make sale of parts of the testator's realty to pay his debts. Thereupon some of the respondents to this bill petitioned this court for an injunctive order forbidding the sale.

*November* 10, 1888. DURFEE, C. J. This bill is brought by the complainants as executors of the will of Daniel Lyman to obtain from the court a construction of the will, and advice in administering the estate under it. The will appoints the complainants, together with Esther D. Chapin, now Mrs. Hammond, executors, and gives them the net income of the estate for the first year as compensation. It requests the payment of debts and expenses, but does not expressly charge the estate with their payment. It makes numerous pecuniary bequests and some devises. The bill is prosecuted against certain persons who are declared to be " all the persons interested in the said will and codicil thereto and in the property bequeathed therein," and against certain corporations which are declared to be all that claim, so far as the complainants know, to be interested in the same. Answers are filed by some of the defendants, some of them containing, by way of alleged cross-bill, prayers that the legacies may be decreed to be a charge on the real estate and on the rents and profits thereof, and that accounts may be taken and said charge enforced, etc., and for general relief.

The bill sets forth that the testator in his lifetime gave a mortgage for $50,000 on his Musee estate, so called, and owed, besides said debt, only a small amount. At a former hearing on a por-

tion of the bill, one of the questions presented was, whether the complainants were bound to pay said mortgage debt, and if so, whether they must first exhaust the personalty, and whether, having done so, they had power to sell the estate for the payment. The court answered that in their opinion it was the duty of the complainants to pay said debt, "exhausting the personal assets before resorting to the real estate," and further that, in case of a resort to the real estate, they would "have to obtain leave to sell from the Court of Probate, the power to sell given by the will being only to sell for the payment of the legacies." A declaratory decree in accordance with the answer was entered without objection from any party. Subsequently certain of the defendants presented a petition setting forth that the complainants "have obtained from the Court of Probate of North Providence a decree purporting to authorize them as executors to sell that part of the testator's estate situated upon the westerly corner of Westminster Street and Walker Street for the payment of said mortgage debt," and praying that they may be enjoined from so doing. The case is now before us on said petition.

The petitioners allege that the decree of the Court of Probate was made before the complainants had exhausted the personal estate, and they question the jurisdiction of the court on that account. Our statute, Pub. Stat. R. I. cap. 185, § 17,[1] provides that whenever the personal estate "shall not be sufficient to pay the debts which the deceased owed, the expenses of his funeral and of supporting his family and settling his estate in the manner

---

[1] As follows :

"SECT. 17. Whenever the personal estate of any person deceased shall not be sufficient to pay the debts which the deceased owed, the expenses of his funeral, and of supporting his family and settling his estate, in manner prescribed by law, the court of probate which shall have granted letters testamentary or of administration on such estate shall thereupon authorize and empower the executor or administrator appointed to settle such estate to make sale at public auction of so much of the land, or of so much of the wood or timber standing or growing on the land, or of so much of the stone in the quarry or otherwise on the land, or of so much of the coal, or of so much of the peat on the land of such deceased person, as shall be necessary to make up the deficiency of the personal estate for the purpose aforesaid, with incidental charges."

prescribed by law," the court of probate shall authorize the executor or administrator to sell so much of the real estate as shall be necessary to make up the deficiency. Another provision, cap. 179, § 13,[1] empowers the court to authorize the sale of an entire estate, instead of so much simply as will be needed to make up the deficiency, when such a sale will be more advantageous to all concerned, the surplus beyond what is required to make up the deficiency to go as the estate would have gone if not sold. These provisions do not require that the personal estate shall be first exhausted, but only that it shall be insufficient. A prior exhaustion may be necessary in some cases to prove the insufficiency, but surely not in all; and there may be cases where, the insufficiency being manifest, it would be bad management to wait for such an exhaustion, since there may be delays which cannot be avoided in getting in the personal assets and converting them into money.

The petitioners also claim that, under the decree of this court above mentioned, it was improper for the complainants to apply for leave to sell the realty without first exhausting the personal assets, and that they ought to be enjoined on that account. This court declared that " it is the duty of the complainants to pay the mortgage debt of $50,000, exhausting the personal assets before resorting to the real estate." If the complainants do not follow the advice of the court, they will not be entitled to the protection of the court if the estate suffers in consequence; but it does not follow, because they have procured the decree of the probate court, that they intend to sell under it before exhausting the personalty; and the petition is, not that they may be restrained temporarily until the personalty has been exhausted, but that they may be permanently enjoined.

The petitioners urge that no part of the real estate ought to be sold to pay the mortgage debt except the part which is mortgaged.

---

[1] As follows :

" SECT. 13. In case of such petitions, if it should appear that, by a sale of only so much of the real estate as was absolutely needed, the residue of the estate or some specific part thereof would be so much injured as to render the sale of the whole estate more advantageous to those interested therein, the court may order the whole, as well as any specific part thereof, to be sold."

We do not see why not. After the mortgage debt has been paid, the sale of that part will no longer be embarrassed by the mortgage, and it is admitted that that part will have to be sold for the payment of the pecuniary legacies if it is not sold for the payment of the debts.

The main reason assigned for the injunction is that the suit, by force of the bill and answer, is an administration suit, and the petitioners are, therefore, entitled to have the estate taken out of the hands of the executors and administered by the court itself through the agency of masters or other officers of its own appointment. Conceding that this may be done by the court, we do not think the court is bound to do it. The testator has appointed the persons by whom he wished to have his will executed, and it seems to us that his wish in this respect ought to be respected as an integral part of his will, so far as it can be consistently with the rights of others. Moreover, the executors have already received, in the first year's income which they have received, their compensation for executing it. Why should we appoint a master to do in their stead what they have been paid for doing, thus increasing the expenses of administration ? It has been our endeavor to avoid the reproach which too often attaches to suits of this sort by reason of the heavy costs and charges. In *Wadsworth et al* v. *Davis's Adm'r*, 63 N. Car. 251, which was a creditor's bill against the administrator of the deceased debtor, the court held that the court might either compel the administrator to sell the real estate, the personal being exhausted, or might itself sell it through the proper officer. Here the executors are ready to go on and complete the administration without compulsion, if they are permitted to do so under the advice of the court.

At the former hearing we decided that the will does not give the executors power to sell the real estate for the payment of debts, and declared that they would have to apply to the probate court for leave to sell if the personal assets were insufficient. They applied under our advice. We advised the application because jurisdiction to give executors leave to sell is vested by the statute solely in the court of probate by which the will has been proved, in the first instance, and on appeal in this court, sitting, however, not in equity, but as the appellate Court of Probate.

The petitioners say we might have appointed a master to sell the real estate under the charge thereon imposed by the statute, or given impliedly by the will. Granting that we might have done so, which we do not decide, the question is, were we bound to do so? If we could have done so, it would have been contrary to the course of equity practice for us to do so, since the creditors are not parties to the bill, and the charges are charges in their favor. The petitioners contend that the court having taken jurisdiction for certain purposes, is bound by the general rule to conduct the administration to its conclusion, and that, therefore, the application to the Probate Court was irregular, if not void. Ordinarily, without doubt, the court, having taken jurisdiction for certain purposes, will retain it and administer complete relief, but we do not understand that this is the invariable rule. The courts do not always do so in bills for discovery, and there are cases which hold that they may do so or not, according to their discretion, in bills for instruction. 1 Story Eq. Juris. § 73 ; *Mallory's Adm'r* v. *Craige,* 15 N. J. Eq. 73 ; *Crosby* v. *Mason,* 32 Conn. 482, 484. This court has entertained numerous bills for instruction, and sometimes has retained the cause until the administration was closed, and sometimes, and we think more frequently, has simply given the instruction asked for, leaving the executor to administer accordingly. But, applying the rule invoked by the petitioners the most strictly, we do not think it would exclude the court from using other courts as auxiliary to itself. If the complainants had begun an action at law for a debt due to the estate before this bill was filed, we think there can be no doubt that the action would be allowed to go on ; and if meanwhile the complainants should die, that the court of probate would be permitted to appoint an administrator or administrators to succeed them. It has been said that when a court of equity " can determine a matter, it should not be a handmaid to the other courts," but we are not aware that it has ever been said that it shall never use the other courts as handmaids to itself.

The petitioners and the residuary legatee or devisee have by their counsel joined in a request to the complainants, as executors, to go on under the power given them in the will and sell real estate for the payment of legacies. We can see no difference, so

far as the propriety of allowing the executors to sell is concerned, whether the power to sell is given to them by the will, or enures to them by leave of the probate court under a statute of the State.

We think the case at bar is one in which it is highly proper that the court should superintend the administration to its close, and if interlocutory orders other than those already made are necessary to such superintendence we see no reason why they should not be entered ; but we do not think it is necessary to that end to take the estate wholly out of the hands of the executors, they being submissive to our direction.      *Injunction denied.*

*William G. Roelker*, for complainants.

*James Tillinghast*, for petitioning respondents.


Subsequently the case came again before the court for hearing on questions submitted by the executors, and on others raised by the answers, and on exceptions to the report of the master to whom the case had been sent to report on various claims made to the charitable bequests contained in the will.

*March* 16, 1889.    DURFEE, C. J.   We are asked to decide certain questions arising under the will and codicil of the late Daniel W. Lyman.

*First.* The first clause of the will contains the following, to wit : " I desire so much of the real estate I may die seized and possessed of as may be necessary to pay the following legacies to be sold, and from the proceeds of such sale the following legacies paid to the following persons and institutions and societies." Then follow numerous pecuniary legacies and some devises, and a residuary clause by which the testator gives " all the residue of my property, both real and personal, remaining after paying all legacies, expenses," etc., to his cousin, Esther D. Chapin, for life with remainders over. The will was executed July 14, A. D. 1885. On September 18, A. D. 1886, the testator executed a codicil, beginning as follows, to wit : " W.hereas, owing to certain changes in human affairs, which affect more or less the foregoing instrument, I do hereby make this my codicil to my will and testament as follows." The first clause changes a devise of real estate. The second clause states the death of a legatee to whom

he had given $10,000 by the will, and bequeaths said sum to three other legatees. The third clause bequeaths $10,000 to Amory Chapin, and the fourth $25,000 in trust to Frances Jones Chapin for life, and after her death to Brown University as a fund for the education of poor students, etc. The question is, whether the legatees under said third and fourth clauses are entitled to have their legacies paid on the same footing as the pecuniary legatees under the will, the estate being insufficient to pay all the legacies in full. We think they are. In the codicil the testator calls the will "the foregoing instrument," and makes the codicil as "this my codicil to my will and testament," thus uniting the will and codicil so that the legacies in the codicil are, equally with the legacies in the will, "the following legacies" for the payment of which the executors are desired by the first clause of the will to sell so much of the real estate as may be necessary. If it be said that the legacies of the codicil were not "the following legacies" when these words were written, the answer is that the codicil operated as a republication of the will, making it speak as of the later date of the codicil. 1 Jarman on Wills, cap. 8 ; *Evans* v. *Evans*, 17 Simons 86, 108; *Hartley* v. *Tribber*, 16 Beav. 510 ; 1 Redfield on Wills, *287, *288. " If the will be republished," says Chief Justice Shaw, " then all the words contained in it which have reference to time must be considered as applying to the time of the republication, and not to that of the original will." *Haven* v. *Foster*, 14 Pick. 534, 540. It is evident that, to have any effect, the legacies given by the codicil must have place with the legacies given by the original will so far as to have priority to the residuary devise, and, if so, we do not see why they should be postponed to the legacies given by the original will to any extent, there being nothing indicating an intent to have them postponed. It is well settled that all codicils are to be regarded as parts of the will, and are to be construed together with it as one instrument or testamentary disposition. 1 Redfield on Wills, *287, *288; 1 Williams on Executors, 6th Amer. ed. 8. If the legacies given by the third and fourth clauses of the codicil are to be paid on the same footing with the pecuniary legacies given by the original will, still more clearly are the legacies given by the second clause to be so paid, they being substitutions for the $10,000

legacy in the original will. 1 Jarman on Wills, *185; 1 Roper on Legacies, *185; *Pond* v. *Allen*, 15 R. I. 171.

*Second.* The will contains the following bequest, to wit: "To The Nursery I give five thousand (5,000) dollars." There was no corporation having the corporate name of "The Nursery" when the will was written, but four charitable corporations claim the bequest. The case was sent to a master for him to investigate their claims and report thereon, and it now comes before us on exceptions to his finding. It appears that A. D. 1872 an act was passed by the General Assembly creating a corporation under the name of the "Providence Nursery," and that an amendment thereto was passed A. D. 1879, changing the name to "The Rhode Island Children's Hospital and Nursery of Providence." The principal work of this corporation was to care for poor children under three years old, day and night. It was a well known charity, and was popularly called "The Nursery." It had appealed to the public for pecuniary aid by entertainments and otherwise as "The Nursery." The testator was accustomed to contribute to it as "The Nursery," and to speak of it by that name. But in April, 1881, more than four years before the testator made his will, it had abandoned its work for lack of funds, and had transferred its property and the children whom it was caring for to St. Mary's Orphanage, a charitable corporation in East Providence, and the testator had since then discontinued his contributions to it. St. Mary's Orphanage has maintained the Nursery since the transfer, in connection with its other work, having on an average half its inmates in the Nursery. In 1884 the testator was asked to contribute to the Orphanage. He said, "You mean the Nursery." The solicitor said, "No, the Orphanage." To which he replied, "It is the same thing," and contributed. The early friends of The Nursery often called the Orphanage The Nursery after its transfer. It seems to us that the Orphanage makes a better case for the bequest than the Rhode Island Children's Hospital and Nursery, for evidently the bequest was intended for the benefit of The Nursery as a favorite charity, and should go to the corporation as the medium through which the benefit would reach its destination.

We think it also makes a better case than the Grace Memorial

Home, which, prior to its incorporation, carried on its work under the name of the "Day Nursery." Its work began only a few months before the execution of the will, and without either assistance, or, so far as appears, favor from the testator.

The fourth claimant is The Providence Shelter for Colored Children, which was for children between three and twelve years old, and in some instances under three years old. Its charter provides: "No children are to be received into the Shelter under three years of age, unless attended by peculiar circumstances." It is a children's home rather than a nursery. It was never popularly known as The Nursery, and it does not appear that the testator ever took an interest in it or contributed to it. His cousin, Mrs. Frances J. Chapin, who is interested in it, testifies that he was in the habit of calling it " the Nigger Nursery ;" that he wrote his will at her house, and consulted her about the legacies ; that he read it to her before signing it ; that she asked him to leave something to the Shelter, and he replied that he had left $5,000 to it ; that she told him he had made a mistake and called it The Nursery ; that he replied, " You know what I mean, I mean the Nigger Nursery," pointing toward the Shelter ; that she asked him to change the word, but he said, " You know what I mean," and declined because he did not' wish to scratch anything out. The testimony, so far as it relates the conversation, is objected to as inadmissible. The objection seems to us to be well taken. The testimony is not within the rule under which extrinsic testimony is ordinarily received to elucidate the testamentary intent, namely, that when a devise or bequest is expressed in terms which apply indifferently to two or more persons or institutions claiming the benefit thereof, then extrinsic testimony may be resorted to to show which of them was intended. For, as we have seen, the Shelter was never called or known as The Nursery, and, properly speaking, it is not a nursery. The effort is to impose upon the will by extrinsic testimony a meaning which, taking it as it naturally applies to existing facts and circumstances, it does not express. It is an effort which contravenes the fundamental requirement of the law that a will shall be in writing ; that is, that it shall be a *written expression* of the testator's intention.

But granting that the testimony is admissible, it does not carry

conviction.   The testator knew that there was a charity called "The Nursery," and if he had intended to give to The Shelter instead of The Nursery, it is incredible that he would have refused to alter the bequest, or, indeed, that he would have put it originally in a form to need alteration.   His excuse that he did not wish to scratch anything out was evidently a pretence; for it is in evidence that the will has both an interlineation and an erasure. His entire talk about "the Nigger Nursery," and "You know what I mean," and the pointing, seem to us much more like a playful method of putting his cousin's request aside than like a serious purpose to accede to it.   His calling The Shelter "the Nigger Nursery" does not, to say the least, indicate a benevolent feeling toward it.

The master found in favor of St. Mary's Orphanage.   We confirm his finding.   We think the legacy should be paid to the Orphanage, not for its general purposes, however, but for the benefit of "The Nursery" which it maintains.

*Third.*   The will bequeaths as follows, to wit: "To the Society for the Prevention of Cruelty to Children of the City of Providence, my Mansion House and buildings thereto belonging, situate in the town of North Providence, on Fruit Hill Avenue, so called, and ten (10) acres of land adjoining the same (as my executors may select); also fifty thousand ($50,000) dollars as a fund for the same, said Real Estate and money to be forever used as a home and fund for the maintenance of said home for said children, and if not accepted, or ever discontinued, to revert to Brown University as a 'Poor Students' Fund,' to be used as the Trustees and Corporation of Brown University may determine for that purpose, said fund to be called the 'Daniel Wanton Lyman Fund for Students.'"

The master finds that this bequest was intended as a bequest to the "Rhode Island Society for the Prevention of Cruelty to Children," a corporation duly chartered by the General Assembly at its January session A. D. 1882, and established in the city of Providence, there being no other corporation or society answering the description, and the correctness of his finding is not questioned. Section 4 of the act incorporating said society provided: "This society shall not in its corporate capacity hold real and personal

estate at any one time exceeding in value the sum of ten thousand dollars." The General Assembly, at its January session A. D. 1887, after the death of Daniel Lyman and after the probate of the will and codicil by the Court of Probate of North Providence, and pending an appeal therefrom in this court, at the request of the society, passed an act in amendment of said act of incorporation, authorizing the society to hold real and personal estate not exceeding in value the sum of one hundred thousand dollars. The master reports that at the time of Mr. Lyman's death the society held real and personal property of the value of $10,525.65, with an indebtedness of $5,159.75, which being deducted, would leave a residue of $5,365.90, and, at the time of the probate of the will, property real and personal of the value of $10,742.01, with an indebtedness of $6,479.47, which being deducted would leave a residue of $4,262.54. We are asked to say, in view of these facts, whether the whole of said legacy and devise shall go to the society, and, if not the whole, which part and how much shall go ; and if the whole or any part shall not go, whether the same or such part shall go to the corporation of Brown University, or shall become a part of the residuary estate under the will.

The primary question is, whether a corporation, whose capacity to hold property is limited by its charter, can nevertheless take or hold as devisee or legatee in excess of the limit. There is some conflict of decision on this question. The doctrine of some of the cases is that the limit is operative only in favor of the State, and that as against all other persons the corporation can take and hold the same as if no limit were prescribed. The cases in which this doctrine has been declared have been for the most part cases where the corporations exceeding their limits have done so by purchase for value, and consequently where the vendor was estopped by his own conveyance from contesting the title conveyed, and equally so his heirs, or where the persons challenging the title were mere strangers to it, and as such in no position to question its validity. The doctrine, however, is laid down in *Jones* v. *Habersham*, 107 U. S. 174, 183, and in *De Camp* v. *Dobbins*, 29 N. J. Eq. 35, and in those two cases there was no estoppel, the property having been given by will. In each of them, however, the act imposing the limit had been altered or repealed before the will went into effect,

so that the decision did not necessarily rest on the doctrine, and it would seem that the doctrine received only a cursory consideration. Moreover, *De Camp* v. *Dobbins* was reheard on appeal, and in the appellate court, though the decision of the court below was affirmed, Chief Justice Beasley, in delivering judgment, took occasion to disavow the doctrine very emphatically, giving reasons for the disavowal. See *De Camp* v. *Dobbins*, 31 N. J. Eq. 671, 690.

The doctrine of the three following cases is, that where property is given by will to a corporation, whose capacity to take or hold is limited by charter, or by the general statute law, the gift will be invalid in so far as it exceeds the limit, and to that extent will either go over under the will, or descend as intestate to the heirs or next of kin of the testator. *Gromie's Heirs* v. *Louisville Orphans' Home Society*, 3 Bush, Ky. 865, decided A. D. 1867 ; *Chamberlain* v. *Chamberlain*, 43 N. Y. 424, decided A. D. 1871 ; *Matter of McGraw* v. *Cornell University*, 52 N. Y. Supreme Court, 354, decided A. D. 1887.

In the first named case the gift was a residuary gift of real and personal estate, by the will of a citizen of Kentucky, to a charitable institution in New York, incorporated under a law of that State, by which it was authorized to take and hold real estate to an amount not exceeding $50,000 in value, and personal estate to an amount not exceeding $75,000 in value. The Court of Appeals of Kentucky, sitting in equity, decided that, inasmuch as it appeared that the institution had, when the testator died, real estate in excess of its limit, it should take no part of the real estate devised, and that it should take only so much of the personal estate bequeathed as should be required to carry its personal estate up to $75,000, and that the whole of the real estate, and so much of the personal estate as should not be required as aforesaid, should go as intestate to the heirs and next of kin of the testator.

In *Chamberlain* v. *Chamberlain*, the gift was a residuary gift to an incorporated academy, authorized as such to take and hold, by gift, grant, or devise, real and personal property, the clear yearly income or revenue of which should not exceed the value of $4,000, and the court held that it was not entitled to take as legatee beyond that limit. Said the court : " The institute can take and hold property within the limit prescribed, but can

neither take or hold in excess of that limit. Effect will not be given to a transgressive bequest in excess of the amount authorized. Claiming property and seeking the aid of the court to reach it, the corporation can rely only on the warrant and authority conferred by law, and cannot claim in transgression or excess of that authority. The statute permits the corporation to take property of a given yearly value, and prohibits the taking in excess of that value."

In *The Matter of McGraw*, the gift was a residuary gift of a very large property to Cornell University. The charter of Cornell University provided that " the corporation hereby created may hold real and personal property to an amount not exceeding three millions of dollars in the aggregate." The University had property to that amount when the testator died. The question was whether, nothwithstanding this, it was entitled to take as legatee under the will in opposition to the claims of the heirs or next of kin. The Supreme Court decided, after careful consideration and on the authority of *Chamberlain* v. *Chamberlain*, that it could not. Thereupon the case was appealed to the Court of Appeals, where the judgment of the Supreme Court was affirmed. *Matter of McGraw*, 111 N. Y. 66.

On account of the magnitude of the interests at stake, the case received in the Court of Appeals from both counsel and court an elaborate and exhaustive study and discussion. There is no reason to suppose that any argument or authority of any value, bearing upon the subject, can have escaped a thorough scrutiny and consideration. The conclusion of so able and learned a tribunal, so reached, though not binding on us merely as authority, is eminently entitled to respect, and it seems to us to be correct.

We do not think it would serve any good purpose for us to reproduce, in an abridged form, the excellent exposition of the learned judge who prepared the opinion. It seems to us that the natural and logical conclusion, independently of authority, is, that an artificial body created by law, without capacity to take or hold property beyond a certain limit, cannot, by reason of the very law of its being, take or hold property beyond that limit, and consequently that the courts ought to recognize the fact in favor of any person who is entitled, on supposition of the incapacity of the

corporation, unless by estoppel or otherwise such person is precluded from making claim. The contrary view seems to have originated, partly at least, in the analogy which was supposed to exist between laws limiting corporate capacity in this respect and the old law of mortmain or the law of alienage. But the analogy, such as it is, is not close enough, as is clearly shown in *The Matter of McGraw*, to warrant such a view. The statutes of mortmain were so worded that they were construed, not to prohibit absolutely grants of land to corporations without license from the crown, but only to render such grants defeasible by the feudal superior of the grantor by entry for that purpose; and they were, in default of entry by any other feudal superior, forfeitable to the crown. And so, also, an alien might purchase land or take it by devise, but he would do so at the risk of having it forfeited to the crown upon inquest of office found. These old laws, founded on feudal reasons, throw little light on the meaning of modern statutes.

The provision in the charter of the Society for the Prevention of Cruelty to Children was not, as we have seen, that the society should not *take* property exceeding $10,000 in value, but that it should not *hold* it, and it is contended that, under this language, it was competent for the society to take the property devised, and, except as against the State, to hold it, and that, the State having enlarged its capacity, it can now hold it absolutely. The same argument was pressed with great ingenuity and in various forms in *The Matter of McGraw*, and the court, after patiently examining the argument in all its phases, held it to be unsound. The question is, of course, a question of legislative intent. It seems to us that the limitation on the power of the corporation to hold is necessarily an implied limitation on the power to take, for why take what it cannot hold? Indeed, the very act of taking involves an act of holding, momentarily at least. And, if the illustration be permissible, a vessel which is as full as it can *hold* is incapable of *taking* any more. And see *Bank of Michigan* v. *Niles*, 1 Dougl. Mich. 401.

We do not think the amendment of the charter, by which the capacity of the society to hold property was enlarged, is effectual to enable the society to take under the will in its larger capacity.

The will, though the probate was not completed until after the amendment, took effect by relation, when proved, from the death of the testator, and became operative from that time, as if it was a special law of descent for the estate disposed of by it, and the rights of all persons, designated as devisees or legatees therein, are to be regarded as determined by it at that time, unless dependent on future contingencies. It follows that the property given to the society, beyond its capacity to hold, became immediately subject to the other dispositions of the will.

The counsel for the society contends that the gift to the society was in effect a gift in trust for charitable uses, and if the society was incapable of taking, the trust nevertheless will survive to be executed by a trustee to be appointed by the court. This might be so if the testator himself had not provided what should be done in case of nonacceptance by the society. The language is, " if not accepted, or ever discontinued, to revert to Brown University." The gift, in excess of the charter limit, was not accepted, the society being incapable of accepting it, and therefore the property given in excess of that limit went by the will to Brown University.

Another question presented is, whether the society, inasmuch as it cannot take the whole gift, is entitled to any part of it. The answer is not free from doubt, but it seems to us that the will should be carried out in favor of the society so far as possible in the absence of any clear manifestation of an intent to have the gift pass as a whole, the inability to take the whole being the misfortune, not the fault, of the society. We decide that the society is entitled to take so much of the gift as is necessary to carry the property, held by the society at the death of the testator, to the charter limit, the debts of the society to be deducted in ascertaining the amount which the society then held.

We are of the opinion that the real estate constituting a part of the gift must be regarded as a specific devise, and it will not be subject to abatement. We think the ten acres adjoining the mansion house, which are to go with it, should be selected by the executors who have qualified. Pub. Stat. R. I. cap. 184, § 21.[1] The

---

[1] As follows:

" SECT. 21. If any testator shall appoint more than one executor of his will,

making the selection is simply the execution of a power, and may very properly be effected by an instrument under seal, though we do not see that a seal is indispensable. We think a proper form will be for the executors to recite the clause of the will which confers the power upon them, and then, stating their action under it, to set apart by apt words of description and appropriation the ten acres which they have selected. We think the $50,000, given in connection with the house and land, is not to be regarded as a specific bequest, but should abate in common with the other legacies.

*Fourth.* The will makes several pecuniary bequests in trust for certain persons for life with remainder over. The estate being insufficient to pay the legacies in full, we are asked to decide in what manner, as between the life tenants and remaindermen, the legacies are to abate. Our answer is that they must abate proportionately. After the legacies have been set apart in trust, the life tenants will be entitled to the income of them as set apart. The net income of the estate for the first year after the death of the testator is bequeathed specifically by the will to the executors, and therefore no part of it is apportionable to the life tenants for that year. After the first year and until the legacies are set apart, they are entitled to their proportionate share of the net income, that is to say, of the income less the taxes and less the interest, if any, accruing after the first year on any debts remaining unpaid after that time. *Bailey, Petitioner,* 13 R. I. 543, 561, and cases there cited; *Croly* v. *Weld,* 3 De G., M. & G., 993; *Tinkler's Estate, in re,* L. R. 20 Eq. 456; *Cox* v. *Cox,* L. R. 8 Eq. 343.

We see no objection to the executors paying to the legatees portions of what the legatees are entitled to from time to time in course of settlement, so far as they can safely do so.

The executors ask us to modify the decree, heretofore entered by us, instructing them to exhaust the personal estate in the payment of debts before resorting to the real estate, by allowing them to exercise a discretion in the matter, on the ground that

and some of them do not accept the trust, or, having accepted thereof, shall die, those who shall undertake to execute the will, and the survivors of them, shall have the same power and authority as is given by such will to the whole of them, to every intent and purpose whatsoever."

the personal estate now remaining unsold, to wit, fourteen shares in the capital stock of the Providence Drying, Bleaching, and Callendering Company, though of much intrinsic value, cannot be sold immediately, as the executors have ascertained by repeated attempts to sell it, without great sacrifice or loss. The affidavits filed in support of the request give certain reasons for supposing that the shares will become more marketable in the future ; but it seems to us that the reasons are too much matter of speculation, and too indefinite as to time, for us to yield to them, if indeed the statute is not too peremptory to allow us to do so. The executors are not obliged to sell the shares in lump, if they can sell them one or two at a time to better advantage.

*William G. Roelker*, for complainants.

*Walter F. Angell & John C. B. Woods*, for Brown University.

*Robert W. Burbank*, for the Rhode Island Society for the Prevention of Cruelty to Children.

*Rathbone Gardner*, for the Grace Memorial Home.

*Joseph C. Ely*, for the Rhode Island Children's Hospital and Nursery.

*William W. Douglas & Samuel T. Douglas*, for the Providence Shelter for Colored Children.

*Daniel L. D. Granger*, for the St. Mary's Orphanage.

*Arnold Green*, for Amory Chapin and Frances J. Chapin.

*Nicholas Van Slyck*, for the City of Providence.

*James Tillinghast*, for Walter A. Peck and the proprietors of Swan Point Cemetery.