MARY E. KENNETT, *Appellant*, v. MRS. HOWARD KIDD et al., *Appellees.*

No. 17,742.

SYLLABUS BY THE COURT.

1. WILL—*Legatee—Modern Woodmen—Witnesses.* A provision in a will giving property to a local camp of Modern Woodmen is not void because the will was witnessed by members of such camp.

2. FRATERNAL INSURANCE ORDERS—*Can Not Take Under a Will.* Fraternal insurance orders being under the rules and restrictions of the statute, such local camp is not competent to take and hold property given to it by will, its legal source of income being dues, premiums and assessments.

3. ——— *Same.* Under sections 1832-1834 of the General Statutes of 1909 such camp is authorized to hold only such real estate, including buildings, as may be necessary to provide suitable accommodations for holding meetings and transacting business, although such necessary buildings may be used in part for other purposes.

4. WILLS—*Invalid Bequests—Heirs May Assert Invalidity.* When a testator has attempted to devise and bequeath to such

Kennett v. Kidd.

camp real and personal property, his heirs may affirmatively or defensively assert the invalidity of such provision and the inability of the camp to take thereunder.

Appeal from Geary district court. Opinion filed July 6, 1912. Modified.

*Lee Monroe, W. S. Roark,* and *Carr W. Taylor,* all of Topeka, for the appellant.

*Ernest R. Simon,* and *James A. McClure,* both of Topeka, *J. V. Humphrey,* of Junction City, and *F. L. Williams,* of Clay Center, for the appellees.

The opinion of the court was delivered by

WEST, J.: This action was brought by Mary E. Kennett to set aside the will of her father, John C. Kennett, who departed this life March 30, 1910, having executed the instrument six days before. The plaintiff testified that she lived with her father as a member of the family until she was about thirty years of age. Her mother died when she was four, and when she was nineteen her father remarried. After a son, named Frank, of the second marriage became about ten years old her father appears to have separated from the family and the plaintiff continued to prepare his meals and take them to him. The half brother lived with the brother and sister for about twelve years. Plaintiff had the care of Frank, the half brother, the stepmother having left the home when the boy was about three and a half years of age. When about sixteen he left home, and afterwards returned and stayed for a time. Plaintiff continued to keep house and lived with William up to the time of his death, which occurred in August, 1909. The father and daughter had nothing to do with each other and did not speak for about fifteen years, until after the elder brother, William, died, when they became friendly.

It appears that for many years Mr. Kennett kept a

store at Milford and about a year before his death had a stroke of paralysis which greatly disabled him so that he was unable to attend to the store without help. He appeared greatly attached to his son William whose death seemed greatly to affect him. William belonged to the Woodmen order, members of which officiated at his funeral. He left considerable property and life insurance, all of which this plaintiff received. After Mr. Kennett had become partially paralyzed a membership was applied for in a local Woodmen camp, and certain officers, upon the occasion of a meeting, went over to his store where he was initiated into the order as a social member, but he never attended any of its meetings. The testimony, while doubtful and conflicting on many points, is very clear that he possessed none of the qualifications which would naturally lead to his selection as a social member.

A neighbor, Linscott, who had lived in the vicinity forty-two years and had been postmaster a great many years and had known Mr. Kennett since 1869, called on him in March, 1910, having been sent for with reference to a will. A paper which the testator said was his will was presented to Mr. Linscott for examination to see if he thought it correct. He informed Mr. Kennett that he thought it was correct with the exception of some changes in the final execution. The old gentleman spoke about Mrs. Cornwell, his nurse, who would receive $1000. He also spoke of Mrs. Taylor and said he wanted to make some provision for her as she had been kind to him in cooking and caring for him. He made some remarks regarding the provision for the Woodmen and for the Kansas Orphans' Home. He said he had appreciated the latter institution and thought it was very worthy and he wanted to do something for it and he had made provision in his will accordingly. That he had connected himself with the Woodmen in order to have somebody to care for him when he got past caring for himself and had made a

provision for the order. He said that Mary, the plain-
tiff, had ignored him and he would give her only $5.
He asked no advice as to the disposition of the property
but only as to the form of the will. Later he sent for
the witness again, who read the will over. The attesta-
tion having been changed as suggested, Mrs. Cornwell
was called in and the will was read in her presence and
in the presence of the testator. Some two weeks be-
fore this he had drawn up a deed for certain lots to the
Woodmen and given it to the witness, telling him to hold
it until ordered to turn it over. Nothing further was
said concerning this deed. The will, after providing
for a monument and inscription, devised to the plain-
tiff $5, to the son by the second wife $5, to Mrs. Kidd
two lots in Milford, to Mrs. Taylor $500, to Mrs. Corn-
well $1000, to the Kansas Children's Home Society
$1000, and then gave and bequeathed to camp No.
1704 of the Modern Woodmen of America of Milford,
Kansas, "to be used as said Camp may see fit," all the
remainder of his property, real and personal, certain
restrictions being specified against the use of it for
certain purposes and respecting the cutting of growing
timber. Plaintiff, in her petition, alleged that her
father was of unsound mind and had no testamentary
capacity at the time of executing the instrument and
that he was induced by undue influence exercised over
him by officers and members of the Woodmen camp.

While the testimony shows that Mr. Kennett was
about eighty years of age and very feeble, and while
there is an abundance of testimony, pro and con, as to
his mental capacity, the court found against the plain-
tiff, and whatever our opinion might be as to the cor-
rectness of such finding it could not be disturbed, al-
though the testimony fairly shows that Mr. Kennett
had a clear comprehension of property matters and the
way in which he desired his estate to go.

The court also found against the plaintiff on the
question of undue influence, and while the circum-

stances surrounding the peculiar reception of the testator as a social member and the peculiar conduct of members of the local lodge and the gossip occasioned thereby might well justify the conclusion that the object sought was far more financial than social, it is not necessary to determine that question.

It is also argued that as the will was witnessed by members of the local camp who were in reality beneficiaries they were incompetent as. witnesses and for that reason the will should be held for nought. This presents a question on both sides of which much might be said, but the weight of authority is to the effect that members of a corporation are competent to witness a will which bequeaths or devises property to the corporation itself.

It is strenuously insisted that leaving the only daughter a bequest of but $5 renders the will so manifestly unreasonable as to make it a very decided object of suspicion. Two things may be said concerning this: First, that the trial court having found the testator to have possessed sufficient testamentary capacity it must follow that he had the full and complete right to determine for himself the reasonableness or unreasonableness of any devise or bequest made by him. (*Ginter v. Ginter,* 79 Kan. 721, 101 Pac. 634; *Kerr v. Kerr,* 85 Kan. 460, 116 Pac. 880; 1 Underhill on the Law of Wills, § 135.) Second, that while plaintiff was the only daughter, the testimony shows conduct and assertions concerning her father which he might have deemed a sufficient excuse for making no provision whatever for her, in view of the fact that she was a woman of mature years and already fairly well provided for.

It is finally contended that the devise and bequest made to the local camp are void for the reason that. the camp is not competent to take under the will, or rather, to hold the real estate devised. It is argued that the statute (Gen. Stat. 1909, § 1832) restricts the camp in its holding of real estate to such as may be necessary to

provide suitable accommodations for the holding of its meetings and the transaction of its business. Section 1 of chapter 164 of the Laws of 1899 provided that any council or camp "may purchase, own, manage, control, improve and dispose of such real estate, including a suitable building, as may be necessary to provide suitable accommodations for the holding of its meetings and transacting its business; provided, that any such building may be used in part for other purposes." Sections 2 and 3 of the act provided that the title to property mentioned should be vested in the lodge or other subordinate organization and that transfers might be made by the trustees or managers thereof, and that such subordinate organization might contract, sue and be sued through its trustees or managers in any matter affecting such real estate or buildings, but that no judgment rendered against such organization should have any force or effect except as against the property owned as provided in the act. The first provision was amended in 1909 (Laws 1909, ch. 171, § 1) so that the camp "may purchase, own, manage, control, improve, mortgage and dispose of such real estate, including such suitable building or buildings as may be necessary to provide suitable accommodations for the holding of its meetings and transacting of its business, and may purchase, own, manage, control and dispose of stock in a corporation which has for its purpose the building, erection, control, management or ownership of such suitable building or buildings as may be necessary to provide suitable accommodations for the holding of meetings and transacting of business of any organization or organizations as are provided for herein: *Provided,* That any such building or buildings as are provided for herein may be used in part for other purposes." (Gen. Stat. 1909, § 1832.)

The other features of the act of 1899 remain as they were. It is manifest from this legislation that the camp in question can not lawfully hold real estate ex-

42—87 Kan.

cept such as may be necessary to provide suitable accommodations for holding its meetings and transacting its business, including such buildings upon the real estate as may be necessary for such purposes. When, and only when, such buildings and real estate are necessary for these purposes can the lodge lawfully hold the same, but in that case the buildings themselves need not be confined exclusively to lodge purposes, but if used in part therefor they may be used in part for other purposes, the evident intention being that when a camp needs and erects a lodge building it may make it large enough so that a portion of it may be rented and thus furnish an income as a partial return upon the expenditure. With these provisions thus construed it is absurd to claim that a small local lodge could need a farm or body of land such as is covered by the will in question to provide suitable accommodations for holding its meetings and transacting its business.

Somewhat strangely, neither the record nor the briefs advise us as to what the property sought to be given to the camp consists of, except what appears upon the face of the will, and a statement in the brief of the plaintiff's counsel that the residue going to the camp amounts to over $9000. From the fact that Mr. Kennett was engaged in conducting a store it may be assumed that the bequest covered the stock of goods, although its value or the number of acres contained in the land devised does not appear. Somewhat strangely, also, able counsel on both sides have failed to suggest whether or not the camp can lawfully hold the personalty, and the matter has been presented and argued very much as if the entire property sought to be given to the lodge consists of real estate; but as the question of personalty necessarily arises it must be considered and determined. Sections 4303-4318 of the General Statutes of 1909 provide for fraternal beneficiary societies. Section 4310 provides that a fraternal assess-

ment order shall have certain powers "and they and their successors in their corporate name shall, in law, be capable of taking, purchasing, holding and disposing of real and personal estate for the purpose of their corporation." This, of course, must be construed with the provision referred to touching the power of a camp to hold real estate. Section 4303 provides that "the fund from which the payment of the benefits of, such association shall be made, and the fund from which the expenses of such association shall be defrayed, shall be derived from assessments, premiums or dues collected from its members, and interest accumulations thereon." This language would seem to indicate strongly an intention that fraternal beneficiary orders should have but the one source of income, that arising from dues, premiums and ·assessments. (See *State ex rel. v. Vandiver,* 213 Mo. 187, 111 S. W. 911, 15 A. & E. Ann. Cas. 283, where this language is construed.) The local camp, composed of a number of individuals, is an entity of itself, and the gift does not go to the members but to the camp, "to be used as said Camp may see fit." There is no trust for charitable uses, there is no charity. There is simply a gift outright to the local camp of a fraternal order of a large amount of property, real and personal, to be used, not as the law provides but as the camp may see fit. While corporations usually are not prohibited from accepting devises and bequests, and while one of sound mind may give his property to whatsoever persons he desires, it appears to be the legislative policy of the state that fraternal beneficiary societies are to be governed by rules and restrictions applying specifically to them; and indeed this may well be, because such societies are not corporations of the ordinary kind or in the usual acceptation of the term. They are associations of men who voluntarily combine for mutual benefit but who can do so only under the terms and provisions prescribed by the legislature. It might well be argued that

the court can not assume or know judicially that the property in question is not needed for a lodge room or building, but we can not be called upon to indulge in the absurdity of assuming or supposing that the local camp in question could, by any reasonable possibility, need for such purpose property of the value of $9000 or more. Further, if the camp does need a building the law prescribes the source of its income, which is entirely different from that sought to be drawn upon in this case. We think, therefore, as a matter of proper statutory construction and of everyday common sense, that the attempted gift of this property was something of which the camp may not lawfully avail itself.

The question remains, whether any one but the state can call in question the right to hold this property. As a general rule when corporations do acts or attempt to hold property *ultra vires* private parties may not be heard to complain, for the reason that corporations, being the creatures of the state and subject to its sovereign will, are to be corrected only by the state. The rule more frequently applies when the assumed powers render the conveyance voidable and not absolutely void. Approaching the matter from the point of reason and logic we have this situation: The law directs how property undisposed of according to law shall descend at the death of the owner. The law prohibits the devisee in question from taking and holding the property sought to be devised by the testator. Such devise is not voidable but void, therefore the persons whom the law has selected as the proper heirs to this property have a right to object to being deprived thereof, and have the right to assert their statutory claim in opposition to that of the camp, which has no legal basis whatever.

A proposition which seems so consonant with the dictates of reason is fortunately supported by re-

spectable authorities.  Volume 2, Underhill on the Law of Wills, § 841, says:

"Where the amount of the property which a charitable corporation may own is thus expressly limited by statute, every devise or bequest is void so far as it attempts to convey to it the title to property which in value exceeds the limitation mentioned in the statute. The title to the property in excess of the statutory limit does not vest in the corporation, for the statute has deprived the corporate beneficiary of all capacity to take by will so far as the devise exceeds the limitation imposed by statute.  The property thus invalidly disposed of passes to the residuary devisee, in case there is a residuary clause, or, if there be none, then to the heirs or the next of kin of the testator, as intestate property."

If this be true respecting charitable corporations, by so much the more must it be true in regard to fraternal beneficiary associations.  In the *Matter of McGraw*, 111 N. Y. 66, 19 N. E. 233, the statute limited the amount of property which incorporated colleges might take and hold by gift, grant or devise, and it was held that such limitation was a prohibition upon its taking and holding property beyond the amount limited and that the heirs or next of kin of the testatrix could raise the question.  The opinion was by Judge Peckham, who went into an exhaustive examination of the questions presented and the cases cited in the voluminous briefs of counsel.  He quoted (p. 109) with approval from *De Camp v. Dobbins*, 31 N. J. Eq. 671, where it was said:

"Nor can I assent to the other proposition that if, as the contention assumes, this bequest is violative of the law if carried into effect, that none but the state can intervene.  I find no warrant for such a doctrine, either in the legal principles belonging to the subject or in the adjudications. . . . A grantor making title to a corporation might be estopped from questioning the effect of his own conveyance.  So a mere stranger could not question such a corporate title.  But I have not observed any decision that asserts, when a title is

created by devise which vests in a corporation for its own use a larger quantity of property than the laws authorize, that the heir-at-law has no right to make objection." (p. 690.)

After quoting this and other expressions of the doctrine it was said:

"The will does not take effect until the testator's death, and then, if his property is not legally devised or bequeathed, no title vests for a single moment in the devisee or legatee, but it vests instantly in the heir or next of kin; and the corporation claiming under the will asks the aid of the law to give the property to it, and in so doing it must show the authority it has to take." (111 N. Y. 110.)

In *Wood v. Hammond,* 16 R. I. 98, 17 Atl. 324, the supreme court of Rhode Island held that:

"The question of the corporation's power to take the whole legacy may be raised by other persons interested under the will, and the right to object is not limited to the state." (17 Atl. 324, headnote, ¶ 6.)

It was there said:

"The same argument was presented with great ingenuity and in various forms in the *Matter of McGraw,* and the court, after patiently examining the argument in all its phases, held it to be unsound. . . . It follows that the property given to the society beyond its capacity to hold, became immediately subject to the other dispositions of the will." (16 R. I. 119, 120.)

Counsel for the defendant cite *Investment Co. v. Trust Co.,* 65 Kan. 50, 68 Pac. 1089, holding that under the alien land act the state was the only party who could insist upon a forfeiture, but a different question was there involved and the decision is not applicable. *Madden v. The State,* 68 Kan. 658, 75 Pac. 1023, is also cited, but this involved the question under the same alien land act. Also *Harris v. Gas Co.,* 76 Kan. 750, 92 Pac. 1123, which held that the question of the character of business a corporation is authorized to engage in is

ordinarily a matter between it and the state and not open to collateral inquiry. But the opinion quotes (p. 759) from *Pape v. Capitol Bank,* 20 Kan. 440, which held that if the state remains silent during an open and notorious assertion and exercise of corporate powers an individual will not be permitted to raise the inquiry, "unless there be some powerful equity on his side." (p. 445.) In *Kelley v. Forney,* 80 Kan. 145, 101 Pac. 1020, also cited, it was said:

"It is true that Forney appears not only to have been a stockholder in the corporation but to have owned a majority of the stock. If his rights in that capacity were invaded by the lease he might have attacked its validity in an appropriate proceeding. But an action of forcible entry and detainer is not of that character." (p. 147.)

"If then the corporation is not capable of taking land, but nevertheless a devise of land is made directly to it, the devise will be void and the land will revert to the heirs of the grantor, under the theory of his having died intestate as to it; or will pass under other theories to other devisees under other provisions of the will." (10 Cyc. 1130.)

(See, also, *Barton et al. v. King et al.,* 41 Miss. 288.)

It is also claimed that the testator was unconscious of the attestation of the will, but we think the general finding of the court against the appellant in this respect was justified by the evidence. No reason appears why the will, except the portion relating to camp No. 1704, should not be carried out.

The judgment is modified and the property sought to be given to the Woodmen camp must go to the heirs as the law directs.