## J. H. GINTER v. FRED GINTER *et al.*

No. 15,733.    (101 Pac. 634.)

SYLLABUS BY THE COURT.

1. WILLS—*Undue Influence.* To destroy the validity of a will undue influence must amount to coercion, compulsion or constraint which destroys the testator's free agency and by overcoming his power of resistance obliges him to adopt the will of another instead of exercising his own. It must be brought to bear directly upon the testamentary act, and particular parties must be benefited or disfavored as the result of the purpose and pressure of the dominating mind.

2. —— *Fraud—Undue Influence.* Generally the same considerations control when a testator is unduly influenced by misrepresentations and artifices usually comprehended by the term "fraud." Although in strictness fraud and undue influence are distinguishable, more often than otherwise it is a mere matter of a choice of terms. Always something sinister is involved which perverts the testator's will by overcoming his power truly to express his real desires.

3. —— *Presumption of Validity—Burden of Proving Undue Influence.* When a contested will appears to have been duly executed and attested according to the statute of wills the law presumes it to be valid. This presumption must be overcome by proof, and the burden of proof rests upon whoever alleges it to be the product of undue influence or fraud.

4. —— *Evidence of Undue Influence.* In all such cases the proof must be substantial, so that the judges of fact, having a proper understanding of what undue influence is, may perceive by whom and in what manner it has been exercised, and what effect it has had upon the will.

5. —— *Same.* In making his proof a contestant is not limited to the bare facts which he may be able to adduce, but he is entitled to the benefit of all inferences which may be legitimately derived from established facts.

6. —— *Same.* Suspicion, conjecture, possibility or guess that undue influence or fraud has induced a will is not sufficient to support a verdict to that effect.

7. —— *Same.* Power, motive and opportunity to exercise undue influence do not alone authorize the inference that such influence has in fact been exercised.

8. —— *Same.* The mere existence of confidential rela-

46—79 KAN.

tions between a testator and a beneficiary under his will does not raise a presumption that the beneficiary has exercised undue influence over the testator and does not cast upon the beneficiary the burden of disproving undue influence. Those consequences follow only when the beneficiary has been actively concerned in some way with the preparation or execution of the will.

9. ———— *Same.* The right to make a will includes the right to make it according to the testator's own desires, subject only to the statutory restrictions. It is no condition of this right that the will shall please a jury, or a court, or the testator's relatives, or any one else. The giving of unequal portions to the natural objects of the testator's bounty raises no presumption of undue influence. The fact may be considered in determining the question, Is this the testator's will? But in the absence of proof of undue influence it has no weight.

10. ———— *Undue Influence—Fraud—Demurrer to Evidence.* In this case a demurrer was properly sustained to evidence offered in support of an issue of undue influence and fraud in the making of a will.

Error from Shawnee district court; ALSTON W. DANA, judge. Opinion filed April 10, 1909. Affirmed.

### STATEMENT.

ON August 14, 1903, Louis Ginter executed his will, giving one-half of his property to his wife, $100 each to three married daughters, $50 to his son John, and the remainder of his estate to his son Fred. Fred was named as executor, was given the care and management of the estate for five years, and was allowed the same period in which to pay bequests. The will was duly witnessed by S. B. Isenhart and Mae V. Burnett. On January 15, 1904, the testator died, leaving as his heirs the beneficiaries named in the will, and leaving an estate consisting of real and personal property valued at $3000. It may have been worth $3750. In March, 1904, the will was duly probated, and soon afterward John Ginter commenced proceedings to set it aside on the ground of undue influence and fraud practiced upon his father by Fred Ginter.

On the trial the plaintiff's evidence tended to prove that Louis Ginter was about seventy years old when he made his will. He was very deaf, so that conversation with him was quite difficult, and when once an idea was implanted in his mind he clung to it with much tenacity. The son John, who was forty-five years old, had not lived at his father's house for many years, and when the daughters had married they had moved away. The son Fred remained with his father. At the time of the trial he had a wife and four children. Some twelve or fifteen years before his death Louis Ginter entered into a partnership with Fred to engage in farming. At first John was taken in as a member of the firm, but in a few days he had difficulty with his father, who then refused to do further business with him. The partnership between Fred and his father lasted until the latter's death, and through their joint efforts the substantial part of the property disposed of by the will was created. A homestead of 160 acres of land covered by a mortgage of $1100 was so acquired, where both families lived, each partner paying one-half of the expenses. The father had great confidence in Fred—much more than in any other of his children. His disposition was to rely upon persons whom he trusted. Generally he consulted Fred, and as he aged he depended more and more upon Fred and yielded more to his advice than in former years. It might be said that for ten years before his death Fred had been his confidential business adviser.

In 1899 John suffered the loss of a hand through an accident. He was poor, and had a wife and four children to support. After that his father manifested sympathy and affection for him by giving him presents of small value, and both his father and brother indorsed notes for him to enable him to borrow money. In January, 1903, bad feeling existed between John and two of his brothers-in-law. Previous to that time there had been bickerings between John and Fred. In

April, 1903, John noticed a coolness toward him on the part of his father. His father seemed to avoid him, and refused to sign a note for him. The father's birthday occurred on April 5 and a dinner was given at John's house. The father came, but went away soon after dinner. Another dinner was given on August .17, the mother's birthday, but the father did not come. When the mother desired to visit John's house the father took her there, left her, and went on to the home of one of his daughters.

Probably in March, 1903, John and Fred had a conversation relating to the disappearance of some undivided money belonging to Fred and his father. John said: "If father has more money than he has use for, if at father's death the property is equally divided, twenty cents of every dollar that you give away you give away twenty cents of my money." Fred became incensed and said: "You claim that twenty cents out of every dollar is yours, do you?" John replied: "I said that of every dollar father and mother did not use twenty cents of it would be mine if it was divided equally." Fred told his father. Precisely what Fred stated can not be determined, but it may be assumed the substance was that John had said every dollar ought to be accounted for because twenty cents of it belonged to him. One of the sisters heard the conversation and corroborates John's version of it. A little later in March the father spoke of the matter to this daughter. He was angry at John and said that he would show John he would give twenty cents of it whether John wanted him to or not. The daughter endeavored to explain to her father what had occurred, and to make him understand the truth of it, and thought she did so. He said: "If that's the way it is n't quite so bad, but it is n't the way Fred tells it."

In July, 1903, the father, who was much opposed to the use of intoxicating liquors, went to the home of Mr. Rupple, one of his sons-in-law, to inquire about

John's drinking. Mr. Rupple was away and he talked with Mrs. Rupple. He said he had it from pretty good authority that John was drinking heavy; that Fred had told him; and that the day Fred and John and Mr. Rupple had all brought hogs up John had been so drunk he did not know what he was doing and had a racket with the feed-yard man. What Mrs. Rupple said, or what further investigation her father made, is not disclosed. In October, after the will was made, the father talked with another daughter, Mrs. Hill, about John's drinking. He said he had it from good authority John was drinking "like siz," and further said: "If I outlive mother John won't get anything, but if mother outlives me he will get what the law allows him." John testified that he had never been drunk but once, when he was given liquor to deaden the pain after the loss of his hand, and that he was not a drinking man. After the father's death Fred accused John of being drunk on the occasion at the feed-yard, and an altercation ensued.

It appears that Louis Ginter died as the result of an injury received on November 20, 1903. John and two of his sisters testified they did not know of a will until after their father's death.

The trial court sustained a demurrer to the foregoing evidence, and the only question is whether it was sufficient to take the case to the jury on the charge of undue influence and fraud.

*J. J. Schenck,* and *W. E. Atchison,* for plaintiff in error.

*W. W. Harvey,* for defendants in error.

The opinion of the court was delivered by

BURCH, J.: To vitiate a will there must be more than influence. It must be undue influence. To be classed as "undue," influence must place the testator in the attitude of saying: "It is not my will but I must do it."

He must act under such coercion, compulsion or constraint that his own free agency is destroyed. The will or the provision assailed does not truly proceed from him. He becomes the tutored instrument of a dominating mind, which dictates to him what he shall do, compels him to adopt its will instead of exercising his own, and by overcoming his power of resistance impels him to do what he would not have done had he been free from its control.

A testator's favor expressed in a will may be won by devoted attachment, self-sacrificing kindness and the beneficent ministrations of friendship and love. These influences are not undue. We expect partiality to attend them. They bring preferment as their natural reward, and they do not become unrighteous although they establish a general ascendency over the testator, leading him to find comfort and pleasure in gratifying the wishes and desires of the person exercising them. Other less worthy influences may make equally strong appeals and may result in the same general dominion and still be sufferable in contemplation of the law. Influences to induce testamentary disposition may be specific and direct without becoming undue. It is not improper to advise, to persuade, to solicit, to importune, to entreat and to implore. Hopes and fears and even prejudices may be moved. Appeals may be made to vanity and to pride; to the sense of justice and to the obligations of duty; to ties of friendship, of affection and of kindred; to the sentiment of gratitude; to pity for distress and destitution. It is not enough that the testator's convictions be brought into harmony with that of another by such means. His views may be radically changed, but so long as he is not overborne and rendered incapable of acting finally upon his own motives, so long as he remains a free agent, his choice of a course is his own choice, and the will is his will and not that of another.

"If an act has been extorted by force or obtained by

Ginter v. Ginter.

fraud, or induced by artful misrepresentations—or if exhausted patience has yielded to great importunity for the sake of peace, or weakness has been cajoled by excessive and artful flattery, or fear has sought security in concessions to threats or to malevolent indications of the power to mischief—or if over a feeble mind which, if left to itself, might be competent for ordinary affairs, a general dominion has been established, so controlling as to prevent its free agency, and the act has been subject to this influence; in none of these cases is a paper purporting to be a will valid, nor is any other act valid, for in none of them does the act proceed from the volition of the agent. Some or all of these cases make up what is usually comprehended under the term *undue influence,* so familiarly in use with us. It is not influence merely, but *undue* influence, that is always alleged—something excessive and unlawful. It is not the influence of friendship or affection that can be complained of; nor the influence of argument or entreaty, nor the impression made by kindness or prudence, nor even the effect wrought by servile compliance or mean endurance of wrong. It must be something which destroys free agency. Motives of almost every conceivable kind may be offered, and if the mind of the agent, free to reject or adopt the motives, yields its assent, the act is the act of the agent." (*Means v. Means,* 5 Strob. [S. C.] 167, 192.)

"In order to cause a will or deed to be set aside on the ground of fraud and undue influence, it must be established to the satisfaction of the court that the party making it had no free will, but stood *in vinculis.*" (*Conley v. Nailor,* 118 U. S. 127, syllabus, 6 Sup. Ct. 1001, 30 L. Ed. 112.)

"Upon contest of [a] will for undue influence, the question is 'whether the will is the will of the testator, or that of another.' It is not influence that vitiates, but undue influence; and it must go to the extent of depriving the testator of his free agency, and amount to moral coercion which he is unable to resist." (*Peery v. Peery,* 94 Tenn. 328, syllabus, 29 S. W. 1.)

"The influence which the law denominates undue, and which vitiates a will executed under it, must amount to moral or physical coercion, destroying free agency and constraining its subject to do that which but for

it he would not do." (*Westcott v. Sheppard,* 51 N. J. Eq. 315, syllabus, 25 Atl. 254, 30 Atl. 428.)

"Undue influence, such as will invalidate a will, must be something which destroys the free agency of the testator at the time when the instrument is made, and which, in effect, substitutes the will of another for that of the testator. It may be exercised through threats, fraud, importunity, or by the silent, resistless power which the strong often exercise over the weak and infirm; but, however exercised, it must, in order to avoid a will, destroy the free agency of the testator at the time it was made, so that the instrument in fact expresses the mind and intent of some one else, and not his own." (*Schmidt v. Schmidt,* 47 Minn. 451, 457, 50 N. W. 598, 600.)

The English cases dealing with the subject of undue influence fully support these views. The essential principle was clearly comprehended and stated by Mr. Chief Justice Rolle in 1654 in a case the full report of which follows:

"If a man make his will in his sickness, by the over-importuning of his wife, to the end he may be quiet, this shall be said to be a will made by constraint, and shall not be a good will. By Rolle, Chief Justice, in a tryal at the bar in the case of one Hacker and Newborn, Mich. 1654." (82 Eng. Rep., Full Reprint, 834.)

In the case of *Williams v. Goude and Bennett,* 1 Hagg. Eccl. 577, decided in 1828, it was claimed a good-natured, easy, indolent man was unduly influenced by his wife to execute a codicil to his will in her favor. She was a bustling, high-spirited, managing woman, whose exertions and care were probably responsible for the success of his business, and he had great confidence in, and affection for, her. The following extracts from the opinion are pertinent:

"It would be extraordinary if the influence of affection and of warm attachment is to take away the power of benefiting the object of that regard. The influence to vitiate an act must amount to force and coercion destroying free agency—it must not be the influence of affection and attachment—it must not be the mere desire of gratifying the wishes of another; for that would

be a very strong ground in support of a testamentary act: further there must be proof that the act was obtained by this coercion—by importunity which could not be resisted—that it was done merely for the sake of peace—so that the motive was tantamount to force and fear. . . . The general influence arising from his affection and deference for, and from his wish, in the disposition of his property, to gratify and to please, a wife who was the principal means of acquiring that property, she undoubtedly possessed; but that, as I have already observed, will not violate the testamentary act—there must be proof of something amounting to force and coercion in the obtaining of the act itself." (Pages 581, 595.)

In the case of *Earl of Sefton and another v. Hopwood,* 1 Fost. & Fin. (Eng. 1855) 578, Cresswell, J., charged the jury in part as follows:

"I take it that in order to invalidate a will on the score of influence it is not sufficient that you should think the testator has been persuaded into making a will of a particular kind, that he has been persuaded to benefit this or that person to a certain extent, for in that case I fear that a vast number, if not the greater proportion, might be set aside, and what is the sort of influence that is to set aside a will? Is it the influence exercised by acts of attention and kindness? Is it the influence acquired by showing devoted affection? Certainly not. And yet how many wills are made under the influence of feelings so excited. It must be an influence depriving the party of the exercise of his judgment and his free action." (Page 580.)

In 1856 the leading English case of *Boyse v. Rossborough* was decided by the House of Lords (6 H. L. Cas. 2). The following extracts from the opinion of the lord chancellor indicate the doctrine recognized:

"In a popular sense, we often speak of a person exercising undue influence over another, when the influence certainly is not of a nature which would invalidate a will. A young man is often led into dissipation by following the example of a companion of riper years, to whom he looks up, and who leads him to consider habits of dissipation as venial, and perhaps even creditable; the companion is then correctly said to exercise an undue influence. But if in these circum-

stances the young man, influenced by his regard for the person who had thus led him astray, were to make a will and leave to him everything he possessed, such a will certainly could not be impeached on the ground of undue influence. Nor would the case be altered merely because the companion had urged, or even importuned, the young man so to dispose of his property; provided only, that in making such a will the young man was really carrying into effect his own intention formed without either coercion or fraud. . . . In order, therefore, to have something to guide us in our inquiries on this very difficult subject, I am prepared to say that influence, in order to be undue within the meaning of any rule of law which would make it sufficient to vitiate a will, must be an influence exercised either by coercion or by fraud." (Page 47.)

In the case of *Hall v. Hall,* 1 Prob. & Div. (Eng. 1863) 481, Sir J. P. Wilde enunciated the following rules:

"To make a good will a man must be a free agent. But all influences are not unlawful. Persuasion, appeals to the affections or ties of kindred, to a sentiment of gratitude for past services, or pity for future destitution, or the like—these are all legitimate, and may be fairly pressed on a testator. On the other hand, pressure of whatever character, whether acting on the fears or the hopes, if so exerted as to overpower the volition without convincing the judgment, is a species of restraint under which no valid will can be made. Importunity or threats, such as the testator has not the courage to resist, moral command asserted and yielded to for the sake of peace and quiet, or of escaping from distress of mind or social discomfort, these, if carried to a degree in which the free play of the testator's judgment, discretion, or wishes, is overborne, will constitute undue influence, though no force is either used or threatened. In a word, a testator may be led but not driven; and his will must be the offspring of his own volition, and not the record of some one else's." (Page 481.)

In the case of *Parfitt v. Lawless,* 2 Prob. & Div. (Eng. 1872) 462, it was said:

"The natural influence of the parent or guardian over the child, or the husband over the wife, or the

attorney over the client, may lawfully be exerted to obtain a will or legacy, so long as the testator thoroughly understands what he is doing, and is a free agent.    There is nothing illegal in the parent or husband pressing his claims on a child or wife, and obtaining a recognition of those claims in a legacy, provided that that persuasion stop short of coercion, and that the volition of the testator, though biased and impressed by the relation in which he stands to the legatee, is not overborne and subjected to the domination of another."  (Page 469.)

In the case of *Wingrove v. Wingrove*, 11 Prob. Div. (Eng. 1885) 81, Sir James Hannen charged the jury as follows:

"We are all familiar with the use of the word 'influence'; we say that one person has an unbounded influence over another, and we speak of evil influences and good influences, but it is not because one person has unbounded influence over another that therefore when exercised, even though it may be very bad indeed, it is undue influence in the legal sense of the word.   To give you some illustrations of what I mean, a young man may be caught in the toils of a harlot, who makes use of her influence to induce him to make a will in her favor, to the exclusion of his relatives.   It is unfortunately quite natural that a man so entangled should yield to that influence and confer large bounties on the person with whom he has been brought into such relation; yet the law does not attempt to guard against those contingencies.   A man may be the companion of another, and may encourage him in evil courses, and so obtain what is called an undue influence over him, and the consequence may be a will made in his favor.   But that again, shocking as it is, perhaps even worse than the other, will not amount to undue influence.

"To be undue influence in the eye of the law there must be—to sum it up in a word—coercion.   It must not be a case in which a person has been induced by means such as I have suggested to you to come to a conclusion that he or she will make a will in a particular person's favour, because if the testator has only been persuaded or induced by considerations which you may condemn, really and truly to intend to give his property to another, though you may disapprove of the act, yet it is strictly legitimate in the sense of its being legal.

It is only when the will of the person who becomes a testator is coerced into doing that which he or she does not desire to do that it is undue influence.

"The coercion may of course be of different kinds, it may be in the grossest form, such as actual confinement or violence, or a person in the last days or hours of life may have become so weak and feeble, that a very little pressure will be sufficient to bring about the desired result, and it may even be that the mere talking to him at that stage of illness and pressing something upon him may so fatigue the brain that the sick person may be induced, for quietness' sake, to do anything. This would equally be coercion, though not actual violence." (Page 82.)

In the very recent case of *Baudains v. Richardson,* App. Cas. (1906) 169, Lord Macnaghten referred to *Boyse v. Rossborough* as the leading case on the subject, and stated at length and with approval the rules presented in *Wingrove v. Wingrove.*

Mr. Chief Justice Rolle's declaration in the case of *Hacker v. Newborn,* Style (Eng. 1654) 427, controlled the decision in the case of *Roman Catholic Episcopal Corporation of Toronto v. O'Connor,* 14 Ont. Law (Canada, 1907) 666, wherein a woman, strong of mind and body, procured a modification of the will of her brother, an old man of sixty-eight or seventy, in her favor.

To destroy the validity of a will undue influence must be specially directed upon the testamentary act so that its effect may be registered there. As the result of the purpose and pressure of the dominating mind particular parties must be benefited or disfavored by the will. Some limitations of this principle should be recognized in cases possessing peculiar features, but its general applicability is supported by both reason and authority.

"After all, whatever sort of influence is alleged, to avoid a will, must appear to have been exerted for the purpose of procuring it to be made." (*Farr v. Thompson, Ex'or,* 1 Chev. [S. C.] 37, 49.)

"If a wife, by her virtues, has gained such an ascendency over her husband, and so riveted his affections that her good pleasure is a law to him, such an

influence can never be a reason for impeaching a will made in her favor, even to the exclusion of the residue of his family; nor would it be safe to set aside a will on the ground of influence, importunity, or undue advantage taken of the testator by his wife, though it should be proved she possessed a powerful influence over his mind and conduct in the general concerns of life, unless there should be proof that such influence was specially exerted to procure a will of such a kind as to be peculiarly acceptable to her, and to the prejudice and disappointment of others." (*Small & als. v. Small,* 4 Maine, 190, 192, 16 Am. Dec. 253.)

"As we understand the rule, the fraud or undue influence, which is required to avoid a will, must be directly connected with its execution. The influence which the law condemns is not the legitimate influence which springs from natural affection, but the malign influence which results from fear, coercion or any other cause that deprives the testator of his free agency in the disposition of his property. And the influence must be specially directed toward the object of procuring a will in favor of particular parties. It is not sufficient that the testator was influenced by the beneficiaries in the ordinary affairs of life, or that he was surrounded by them and in confidential relations with them at the time of its execution." (*McCulloch v. Campbell,* 49 Ark. 367, 371, 5 S. W. 590, 591.)

"Mere general influence, not brought to bear on the testamentary act, is not undue influence; but, in order to constitute undue influence, it must be used directly to procure the will, and must amount to coercion destroying the free agency of the testator. Mere suspicion that undue influence was brought to bear is not sufficient to justify the setting aside of the will." (*Estate of Keegan,* 139 Cal. 123, syllabus, 72 Pac. 828.)

"The undue influence which will avoid a will must be such as operates upon the mind of the testator at the time of making the will, and must be an influence relating to the will; and unless some fraud or misrepresentation was practiced at that time, or some physical or moral coercion then employed, such as to destroy her free agency, the question of undue influence should not be submitted to the jury, and it is not ground for avoiding the will that it is unjust or capricious, if the person

making it has testamentary capacity." (*In re Kaufman*, 117 Cal. 288, syllabus, 49 Pac. 192, 59 Am. St. Rep. 179.)

"To be undue, within the meaning of the law, influence must be such as subjects the will of the testator to that of the person exercising such influence, and makes the paper express the purpose of such person rather than that of the testator himself. It must be equivalent to moral coercion. . . . And such undue influence must be directly connected with the execution of the will, and operating at the time it was made." (*Perkins v. Perkins*, 116 Iowa, 253, 262, 90 N. W. 55, 58.)

"The will of a man who has testamentary capacity can not be avoided merely because it is unaccountably contrary to the common sense of the country. His will, if not contrary to law, stands for the law of descent of *his* property, whether his reasons for it be good or bad, if indeed they be his own, uninduced by unlawful influence from others. Lawful influence, such as that arising from legitimate family and social relations, must be allowed to produce its natural results, even in influencing last wills. However great the influence thus generated may be, it has no taint of unlawfulness in it; and there can be no presumption of its actual unlawful exercise merely from the facts that it is known to have existed, and that it has manifestly operated on the testator's mind as a reason for his testamentary dispositions. Such influences are naturally very unequal, and naturally productive of inequalities in testamentary dispositions; and as they are also lawful in general, and the law can not criticise and measure them so as to attribute to them their proper effect, no will can be condemned because the existence of such an influence is proved, and because the will contains in itself proof of its effect. It is only when such influence is unduly exerted over the very act of devising, so as to prevent the will from being truly the act of the testator, that the law condemns it as a vicious element of the testamentary act." (*Dean v. Negley*, 41 Pa. St. 312, 316, 80 Am. Dec. 620.)

"The undue influence must be an influence exercised in relation to the will itself, not an influence in relation to other matters or transactions. But this principle

must not be carried too far. Where a jury sees that at and near the time when the will sought to be impeached was executed the alleged testator was, in other important transactions, so under the influence of the person benefited by the will that as to them he was not a free agent, but was acting under undue control, the circumstances may be such as fairly to warrant the conclusion, even in the absence of evidence bearing directly on the execution of the will, that in regard to that also the same undue influence was exercised." (*Boyse v. Rossborough,* 6 H. L. Cas. [Eng.] 2, 51.)

"The propositions which he was bound to give reasonable evidence to establish were these: that the plaintiff had interfered in the making of the will, that he had procured the gift of the residue to himself, and that he had brought this about not by persuasion and advice (for that would be perfectly legal), but by some coercion or dominion exercised over the testatrix against her will or by importunity so strong that it could not be resisted." (*Parfitt v. Lawless,* 2 Prob. & Div. [Eng.] 462, 472.)

"There remains another general observation that I must make, and it is this, that it is not sufficient to establish that a person has the power unduly to overbear the will of the testator. It is necessary also to prove that in the particular case that power was exercised, and that it was by means of the exercise of that power that the will, such as it is, has been produced." (*Wingrove v. Wingrove,* 11 Prob. Div. [Eng.] 81, 83.)

See, also, the following decisions to the same effect: *In re Shell's Estate,* 28 Colo. 167, 63 Pac. 413, 53 L. R. A. 387; *Roe et al. v. Taylor,* 45 Ill. 485; *Pooler v. Cristman et al.,* 145 Ill. 405, 34 N. E. 57; *Maynard v. Vinton,* 59 Mich. 139, 26 N. W. 401, 60 Am. Rep. 276, *Gardiner v. Gardiner,* 34 N. Y. 155; *Monroe et al. v. Barclay et al.,* 17 Ohio, 302, 93 Am. Dec. 620; *Woodward v. James,* 3 Strob. (S. C.) 552, 51 Am. Dec. 649; *Williams v. Goude and Bennett,* 1 Hagg. Eccl. (Eng.) 577.

The same considerations control when a testator is unduly influenced by misrepresentations and artifices usually comprehended by the term "fraud." In strict-

ness undue influence and fraud are distinguishable. In one case the mind of the testator is so overmastered that another will is substituted for his own. In the other he is in a sense a free agent but is deceived into acting upon false data. (*Terry et al. v. Buffington and another,* 11 Ga. 337, 56 Am. Dec. 423; *In re Shell's Estate,* 28 Colo. 167, 63 Pac. 413, 53 L. R. A. 387.) But more often than otherwise it is a mere question of terms. Something sinister is involved which perverts the testator's will by overcoming his power truly to express his real desires.

"If fraud be the predicate of a verdict which would take away the important privilege of making a last will, and, consequently, making such property pass to other hands, while it derogates from the character of the chief legatee, surely such fraud should be made to appear from more perspicuous indices of undue influence or conduct; and such influence should be brought to bear against the true disposing mind of the testator in the matter and subject of his last will. This is the point of attack and defense." (*Martin et al. v. Ex'ors of Teague,* 2 Speers [S. C.] 260, 267.)

(See, also, *Matter of Will of Budlong,* 126 N. Y. 423, 27 N. E. 945; *In the Matter of the Probate of the Will of Timothy Jackman—First Appeal,* 26 Wis. 104; *Rishton v. Cobb,* 5 Myl. & Cr. [Eng.] \*145; *Allen v. McPherson,* 1 H. L. Cas. [Eng.] 191; *Boyse v. Rossborough,* 6 H. L. Cas. [Eng.] 2, 51.)

Here again some latitude must be allowed for exceptional cases, but since the ultimate question must always be, Is the document produced the testator's last will? (*Woodward v. James,* 3 Strob. [S. C.] 552) the rule stated in volume 1 of the third edition of Redfield on the Law of Wills, section 38, will generally prevail:

"The cases, in the American courts, all seem to come nearly to the same point, already indicated, as being the true test of undue, or fraudulent, influence, that it must be exerted *male fide,* to produce a result, which the party as a reasonable person was bound to know was unreasonable and unjust; and it must have the effect of producing illusions and confusion in the mind of the

testator, so as either to overcome free agency, or power of judging, upon the true relations between himself and those who might be supposed to have just claims upon his bounty." (Subdiv. 38, p. 489.)

An effort to dispose of property by will is exposed to two hazards: First, that the instrument produced as such may not be the handiwork of the testator, and, second, that his will legally expressed may be frustrated when death has rendered him incapable of defending it. The true identity of the document is safeguarded through certain prescribed formalities insuring due authentication of its execution. The testator's intentions embodied in a will can be made to prevail only by requiring contests to be conducted before a competent tribunal according to just rules calculated to exclude error and demonstrate the truth.

When undue influence is charged a broad field of inquiry is opened.

"The question of undue influence is one of peculiar character; it does not arise until after the death of the one who alone fully knows the influences which have produced the instrument; it does not touch the outward act, the form of the instrument, the signature, the acknowledgment; it enters the shadowy land of the mind in search of its condition and processes. Was the mind strong or weak—clear of comprehension or only feebly grasping the facts suggested? Was the will resolute and firm, or enfeebled by disease and bodily weakness? What prompted the making of the will? Was it the thought of the testatrix, or the suggestion of interested parties? What influences were brought to bear to secure its execution, or the disposition of any specific property? These are inquiries always difficult of solution, often made more so by the fact that the parties most competent to give information are the ones most interested to withhold it." (*Mooney v. Olsen,* 22 Kan. 69, 75.)

This being true, the rules by which it may be determined whether undue influence or fraud, as defined and limited above, have produced a will become of the utmost consequence.

47—79 KAN.

When an instrument is presented in the form of a will which has been duly executed and attested according to the statute of wills the law presumes it to be valid.  This presumption must be overcome by proof, and the burden of proof rests upon whoever alleges it to be the product of undue influence or fraud.  In all cases this proof must be substantial.

"As conformity to statutory requisites is exacted in the execution of a will, to a degree which occasionally sacrifices the earnest desires of a testator and the plainest merit of his legatees to the preservation of valuable general rules, so where the execution has been clearly established strictness should be exercised in examining evidence which may be adduced to rebut the inference of validity that arises from the execution. This inference is the presumption which the common law raises from every solemn act, confirmed in the case of a will by the evidence which is given by the subscribing witnesses whom the statutes require.  When the execution has been marked by circumstances of fair dealing, and the subscribing witnesses have been above suspicion, fully aware of their duty, and competent to perform it, an imputation of incapacity in the testator should be sustained by strong testimony of facts which show a defect of mind existing in a form that the subscribing witnesses may not have detected; and an allegation of undue influence should be proved, so that the judges of fact, having proper conceptions of what undue influence is, may perceive by whom and in what way it has been exerted." (*Means v. Means,* 5 Strob. [S. C.] 167, 190.)

From the nature of the subject the proof is necessarily largely or wholly circumstantial, and the contestant is not confined to the facts which he may be able to adduce, but is entitled to the benefit of all inferences which may be legitimately derived from established facts.

"It is not intended to be said that he upon whom the burthen of proving an issue lies is bound to prove every fact or conclusion of fact upon which the issue depends. From every fact that is proved legitimate and reasonable inferences may, of course, be drawn, and all that is fairly deducible from the evidence is as much proved

for the purpose of a *prima facie* case as if it had been proved directly. I conceive, therefore, that in discussing whether there is in any case evidence to go to the jury, what the court has to consider is this, whether, assuming the evidence to be true, and adding to the direct proof all such inferences of fact as in the exercise of a reasonable intelligence the jury would be warranted in drawing from it, there is sufficient to support the issue." (*Parfitt v. Lawless,* 2 Prob. & Div. [Eng.] 462, 472.)

But the courts are unanimous in holding that suspicion, conjecture, possibility or guess that undue influence or fraud has been exercised is not sufficient to sustain a verdict finding such to be the fact. In the case last cited it was said:

"It was argued that there were certain facts in this case calculated to give rise to serious suspicions, and it seemed to be contended that any conclusions which might suggest themselves by way of suspicion merely, however vague, might properly, if the jury pleased to indulge in them, form the basis of a verdict; and consequently that if facts were proved calculated to generate such suspicions enough had been done to make a case fit to go to the jury. If this proposition were correct, it would follow that the defendant had nothing more to do in a case like the present than to prove that the plaintiff was a Catholic priest, that he was the confessor of the testatrix, and that she had made him her residuary legatee. For, upon this basis of fact, suspicion freely indulged and directed by eloquent comment might easily build up the fabric of undue influence or even fraud." (Page 471.)

In *Beyer v. LeFevre,* 186 U. S. 114, 24 Sup. Ct. 765, 770, 46 L. Ed. 1080, Mr. Justice Brewer, speaking for the court, said:

"One who is familiar with the volume of litigation which is now flooding the courts can not fail to be attracted by the fact that actions to set aside wills are of frequent occurrence. In such actions the testator can not be heard, and very trifling matters are often pressed upon the attention of the court or jury as evidence of want of mental capacity or of the existence of undue influence. Whatever rule may obtain elsewhere,

we wish it distinctly understood to be the rule of the federal courts that the will of a person found to be possessed of sound mind and memory is not to be set aside on evidence tending to show only a possibility or suspicion of undue influence. The expressed intentions of the testator should not be thwarted without clear reason therefor." (Page 125.)

In the case of *Small & als. v. Small*, 4 Maine, \*220, 16 Am. Dec. 253, the opinion reads:

"The evidence on this point is that, prior to the testator's marriage with the appellant, he was remarkably fond of his daughter Mary, but that afterward there was not only a coolness, but a great degree of alienation; his affections were withdrawn from her, and in several instances he treated her with extreme harshness and severity. It appears also that the mother-in-law said she could not live with her, and that she ought not to share in the estate equally with the rest, as she had been so troublesome. It is also in proof that the husband often said his wife was the best woman in the country, and that such an angel of a woman could not do wrong; but no witness has testified as to her having exerted any influence over her husband in the disposal of his estate, though she expressed her opinion to one of the witnesses, as before stated, that Mary ought not to have an equal share with the rest of the family. . . . Have we then any evidence by which we can be justified in the conclusion that she abused the confidence of her husband, and exerted an unlawful influence over his mind, and feelings, and passions, upon the subject of his will, so as to induce him to give his estate to her and her children, to the almost total exclusion of his children by the former marriage from the benefits of that estate? We do not find any proof direct to this point, and we do not feel at liberty to decide this cause or any other on mere conjecture. The law requires proof of facts, especially when the object is to destroy and set aside an act apparently deliberate and executed with all usual and legal formalities." (\*Pages 223, 224.)

Mr. Chief Justice Gilfillan expressed the views of the Minnesota court as follows:

"To make a case of undue influence the will must express the mind and intent of some one else, and not

of the testator. From the nature of the case, the evidence of undue influence will generally be mainly circumstantial. It is not usually exercised openly, in the presence of others, so that it may be directly proved. But the circumstances relied on to show it must be such as, taken all together, point unmistakably to the fact that the mind of the testator was subjected to that of some other person, so that the will is that of the latter, and not of the former; mere ground of conjecture or guess is not enough." (Nelson's Will, 39 Minn. 204, 206, 39 N. W. 143.)

Likewise the authorities are unanimous that power, motive and opportunity to exercise undue influence do not suffice to authorize the inference that such influence has in fact been wielded.

"To invalidate a will on the ground of undue influence there must be affirmative evidence of the facts from which such influence is to be inferred. It is not sufficient to show that a party benefited by a will had the motive and opportunity to exert such influence; there must be evidence that he did exert it." (*Cudney et al. v. Cudney,* 68 N. Y. 148, syllabus.)

"When the probate of a will was contested on the ground of undue influence, and it appeared that the testatrix had testamentary capacity, a present knowledge of the contents of the will, and that its execution was surrounded by all the guards the statute has prescribed to prevent fraud and imposition, *held,* that the will could only be avoided by proof of influence amounting to force or coercion; and that the burden of proving this was upon the party making the allegation; also *held,* the facts that the proponent of the will was a son of the testatrix, that he communicated to the scrivener the provisions to be inserted in the will, and was himself a beneficiary, were insufficient.

"To establish undue influence, there must be evidence that the parent was imposed upon or overcome by the practices of the child, to the benefit of the latter." (*Matter of Will of Martin,* 98 N. Y. 193, syllabus.)

"Something more must be shown than the relation of parent and child, and an opportunity for unfair dealing. There must be evidence that the parent was imposed upon, or overcome by the practices of the child to the benefit of the latter, before the burden of proof

can be shifted." (*Matter of Will of Martin,* 98 N. Y. 193, 197.)

"It is not enough that there be motive and opportunity, as the evidence undoubtedly tends to show there were in this case, but the influence must be exercised and take effect so as to destroy the free agency of the testator, and control the disposition of the property under the will when it is made. Unless the influence of these beneficiaries was unfairly and unlawfully executed [exerted], so as to dominate his will at the time, it is not material that they were interested in the will, or had better opportunities for solicitation or persuasion than the contestants." (*In re Hess' Will,* 48 Minn. 504, 511, 51 N. W. 614, 615, 31 Am. St. Rep. 665.)

"If this testimony tends to prove anything, it is that proponent did not wish the witness to interfere with her opportunity of influencing the testator; but the claim is made that it has some tendency to establish the proposition that the proponent not only had the power of unduly influencing the testator, but that she exercised it respecting the will. To this we reply that we consider it too well settled to need the citation of authorities that undue influence can not be inferred alone from motive or opportunity, that there must also be some testimony, either direct or circumstantial, to show that undue influence not only existed, but that it was exercised with respect to the making of the will itself." (*In re Shell's Estate,* 28 Colo. 167, 174, 63 Pac. 413, 415, 53 L. R. A. 387.)

"While the exercise of undue influence, like fraud, may be established when facts have been proved from which it results, as a reasonable inference, the rule is that the burden of establishing the one, as the other, is always upon the party alleging it. . . . Undue influence can not be presumed against defendant Joseph D. Gilmore from the mere coincidence of opportunity to influence his uncle by being a member of his household at the time and for years before the making of the will, that he went to town for the attorney who drafted the will at the request of his uncle, and that he and his brother and sister were the principal beneficiaries under its provisions; nor will the grouping together of all the facts and circumstances as detailed by any and all the witnesses in this case tend to establish or authorize, as a legal inference, the existence of undue in-

fluence on the part of Joseph D. Gilmore upon the mind of his uncle, or that in making or executing the will the testator was not acting free from the control of any and every one." (*Doherty v. Gilmore,* 136 Mo. 414, 419, 37 S. W. 1127, 1128.)

"The whole testimony upon this point may be briefly summarized as follows: The letters written by Mrs. Lachman show that her daughter Sylvia in 1896 had the power to influence her mother's mind, and to some extent, at least, to control her actions, and that she had the inclination so to do; that thereafter she had the opportunity to do so; and that there are some suspicious circumstances tending to raise a presumption that she or her husband, or both, must have done so during Mrs. Lachman's last illness. But is this sufficient to prove undue influence on their part, or do the facts present such a case as requires the defendants to explain their conduct in the premises? . . . It must be admitted that Mrs. Lachman, being of sound mind and memory, had the unquestioned right to dispose of her property as she saw fit, although her disposition thereof might not accord with the approval of her other relatives or friends, or community at large, if such disposition was her own free will and act. The fact that the daughter Sylvia had both opportunity and motive, and that the instruments executed by her mother made provision for her beyond what the law would have given her, does not create any controlling presumption of undue influence. Nor does the further fact that Mrs. Lachman had some time previously declared her intention to make a different disposition of her property, of itself, have any controlling effect. In order to set aside the instruments on the ground of undue influence, there must be substantial proof of a pressure which overpowered the volition of Mrs. Lachman at the time the instruments were executed." (*Meyer v. Jacobs,* 123 Fed. 900, 908, 911.)

It is familiar law that the existence of certain relations, usually denominated confidential, may impose upon the person in whom trust has been reposed the burden of proving that he has not abused his opportunity of exercising influence to his own profit. It is said that proof of the relationship, as of guardian and ward, attorney and client, physician and patient, priest

and penitent, confidential adviser and consultant, raises a presumption of undue influence. The doctrine is frequently invoked in controversies relating to gifts, contracts, conveyances and other transactions not depending upon death, and in some jurisdictions it has been applied without distinction to cases involving disputed wills. In many instances of the latter kind, however, the reason for interposing the presumption fails, and its indiscriminate indulgence would often be productive of injustice. Therefore many courts have limited the application of the rule to what appears to be its true sphere, viz., those cases in which the ascendent party has been immediately connected with the matter of the preparation or execution of the will. Some of the reasons for the restrictions were stated at length by Lord Penzance in the case of *Parfitt v. Lawless*, 2 Prob. & Div. (Eng.) 462. In that case the plaintiff, a Roman Catholic priest, had resided with the testatrix many years as chaplain, and for a part of the time as confessor. He was confessor when the will in dispute was executed, and he was made residuary legatee. No coercion or dominion over the testatrix relating to the will itself was shown. The opinion reads:

"This rule was granted in order to consider a suggestion strongly pressed that the rules adopted in the courts of equity in relation to gifts *inter vivos* ought to be applied to the making of wills. In equity persons standing in certain relations to one another—such as parent and child, man and wife, doctor and patient, attorney and client, confessor and penitent, guardian and ward—are subject to certain presumptions when transactions between them are brought in question; and if a gift or contract made in favor of him who holds the position of influence is impeached by him who is subject to that influence, the courts of equity cast upon the former the burthen of proving that the transaction was fairly conducted as if between strangers— that the weaker was not unduly impressed by the natural influence of the stronger, or the inexperienced overreached by him of more mature intelligence. Applying this view of the subject to the making of a will,

Ginter v. Ginter.

it was contended in this case that it was enough to shew that a legatee fell within the class enumerated, and that, having done so, the onus was cast upon him of proving that his legacy was not obtained by undue influence. It would be an answer to this argument to say that this has never been and is not the law in this or any other court regarding wills. . . . In the first place, in those cases of gifts or contracts *inter vivos* there is a transaction in which the person benefited at least takes part, whether he unduly urges his influence or not; and in calling upon him to explain the part he took, and the circumstances that brought about the gift or obligation, the court is plainly requiring of him an explanation within his knowledge. But in the case of a legacy under a will the legatee may have, and in point of fact generally has, no part in or even knowledge of the act; and to cast upon him, on the bare proof of the legacy and his relation to the testator, the burthen of shewing how the thing came about, and under what influence or with what motives the legacy was made, or what advice the testator had, professional or otherwise, would be to cast a duty on him which in many, if not most cases, he could not possibly discharge. A more material distinction is this: the influence which is undue in the cases of gifts *inter vivos* is very different from that which is required to set aside a will. In the case of gifts or other transactions *inter vivos* it is considered by the courts of equity that the natural influence which such relations as those in question involve, exerted by those who possess it to obtain a benefit for themselves, is an undue influence. Gifts or contracts brought about by it are, therefore, set aside unless the party benefited by it can shew affirmatively that the other party to the transaction was placed 'in such a position as would enable him to form an absolutely free and unfettered judgment.' *Archer v. Hudson*, 7 Beav. 551. . . . The law regarding wills is very different from this. The natural influence of the parent or guardian over the child, or the husband over the wife, or the attorney over the client, may lawfully be exerted to obtain a will or legacy, so long as the testator thoroughly understands what he is doing, and is a free agent. There is nothing illegal in the parent or husband pressing his claims on a child or wife, and obtaining a recognition of those claims in a legacy, provided that that

persuasion stop short of coercion, and that the volition of the testator, though biased and impressed by the relation in which he stands to the legatee, is not overborne and subjected to the domination of another. . . . This difference, then, between the influence which is held to be undue in the case of transactions *inter vivos* and that which is called undue in relation to a will or legacy is all-important when a question arises of making presumptions or adjusting the burthen of proof. For it may be reasonable enough to presume that a person who had obtained a gift or contract to his own advantage and the detriment of another by way of personal advice or persuasion has availed himself of the natural influence which his position gave him. And in casting upon him the burthen of exculpation the law is only assuming that he has done so. But it is a very different thing to presume, without a particle of proof, that a person so situated has abused his position by the exercise of dominion or the assertion of adverse control.

"For these reasons it seems to me that it would be improper and unjust to throw upon a man in the position of the plaintiff, without any proof that he had any hand whatever in the making of this will, the onus of proving negatively that he did not coerce the testatrix into devising the residue of her land to him. I say coerce, for this is the only matter involved in a plea of undue influence." (Pages 468-470.)

Soon after this decision was reported the court of appeals of Maryland had occasion to consider the subject, and the views of the English tribunal were adopted in full. (*Tyson, et al., v. Tyson's exr's,* 37 Md. 567.) In the case of *Moore v. Spier,* 80 Ala. 129, the supreme court of Alabama had reached a different conclusion from the one just expressed. The question was reëxamined in the case of *Bancroft v. Otis,* 91 Ala. 279, 8 South. 286, 24 Am. St. Rep. 904, *Moore v. Spier* was overruled, and the position was taken indicated by the following extracts from the syllabus and opinion:

"The mere existence of confidential relations between the testator and the principal beneficiary under his will, who is also the proponent, does not raise the presumption that the will was procured by the exercise of undue

influence, nor impose on the proponent the onus of dis-
proving undue influence, fraud, or coercion; there must
be, in addition to that fact, evidence of his active inter-
ference in procuring the execution of the will, before
that presumption arises. (*Moore v. Spier*, 80 Ala. 129,
overruled.)" [Syllabus.] "The authorities to the con-
verse of the proposition declared in *Moore v. Spier* as
to wills, and embodied in the charges under consid-
eration, are almost too numerous to be cited. The
position taken by them is, that the reasons of the
rule which impute undue influence to confidential
relations in respect of contracts and transactions
*inter vivos* do not apply to wills, and that before
testamentary disposition can be presumed to have
been unduly influenced something in addition to the
mere existence of confidential relations must be shown;
as, that the proponent initiated the preparation of the
instrument, or wrote it himself, or gave directions as to
its contents to the draughtsman, or selected the wit-
nesses to be present at its execution, and the like; or, in
short, that the beneficiary, whose interest under the
paper is attacked, was as a matter of fact—aside from
mere presumption of law—active in respect to, or in
some way connected with, the preparation and execution
of the alleged will. According to this line of authority,
confidential relations, coupled with some act done in
the premises, raise the presumption of undue influence
against the proponent in a case like the present one,
but no manner or degree of confidential relationship, of
and by itself, will suffice to thus cast the burden of
proving that the testamentary act was not unduly in-
fluenced upon him. [Citing many cases.]" (Opinion,
p. 286.)

"The rule to which we have adverted seems, how-
ever, to be confined to cases of contracts or gifts *inter
vivos,* and does not apply in all its strictness at least to
gifts by will. It has been held that the fact that the
beneficiary was the guardian, attorney or trustee of the
decedent does not alone create a presumption against a
testamentary gift, or that it was procured by undue in-
fluence. (*Coffin v. Coffin,* 23 N. Y. 9; *Post v. Mason,* 91
N. Y. 539; 43 Am. Rep. 689; *Parfitt v. Lawless,* 2
Prob. & Div. 462.) The mere fact therefore that the
proponent was the attorney of the testatrix did not,
according to the authorities cited, create a presump-
tion against the validity of the legacy given by her will.

But taking all the circumstances together—the fiduciary relation, the change of testamentary intention, the age and mental and physical condition of the decedent, the fact that the proponent was the draftsman and principal beneficiary under the will and took an active part in procuring its execution, and that the testatrix acted without independent advice, a case was made which required explanation, and which imposed upon the proponent the burden of satisfying the court that the will was the free, untrammeled and intelligent expression of the wishes and intention of the testatrix." (*Matter of Will of Smith*, 95 N. Y. 516, 523.)

"The mere fact, therefore, that the proponent stood toward the testator as a priest to a parishioner, coupled with the fact that he was the residuary legatee, does not create a presumption against the validity of the legacy given by the will and throw upon him the burden of establishing the absence of undue influence. If, however, these bare facts are combined with other circumstances tending to show imposition, such a presumption arises, and the burden is cast upon the legatee to rebut it. . . . It seems, therefore, to be settled that the voidability of gifts *inter vivos* and the invalidity of wills upon the ground of undue influence rest upon different considerations. In the first class of cases there arises a *prima facie* presumption of undue influence whenever a donee occupies a confidential relation to the donor. In this class of cases it is essential that the donor shall have the opportunity of receiving advice from an independent competent adviser. . . . But in the second class of cases there is no *prima facie* presumption of undue influence merely because the beneficiary stood in a confidential attitude toward the testator. Nor does the fact that the testator did not seek or have independent advice, of itself, raise a presumption of undue influence." (*Sparks' Case*, 63 N. J. Eq. 242, 247, 248, 51 Atl. 118.)

"The rule casting upon the recipient of a gift or conveyance from another to whom he stands in a fiduciary relation the burden of proving the absence of undue influence, when the gift or conveyance is attacked, does not apply to wills.

"Proof that the executor had been the guardian of the testatrix until a short time before the will was made, and that members of his family were substantially

benefited by the will, which he assisted in preparing no further than to request the attendance of witnesses, does not cast upon the defendants the burden of proving there was no undue influence, although such facts may be considered by the jury as bearing upon the question." (*Michael v. Marshall*, 201 Ill. 70, syllabus, 66 N. E. 273.)

"The mere fact that the sole beneficiary under a will was the confidential companion and business adviser of the testatrix for several years prior to her death does not throw the burden of proof upon such beneficiary to show that the will was the spontaneous act of the decedent, where there is no evidence whatever that such beneficiary took advantage of her position and relation to influence the testatrix in her own interest beforehand, or that she participated either in the preparation or execution of the will, or even knew of its existence and contents until some time after it had been made." (*Wheeler v. Whipple*, 44 N. J. Eq. 141, syllabus, 14 Atl. 275.)

"The evidence as to undue influence is not sufficient to justify a verdict in favor of contestant. The most that can be said for it is that defendant, who had charge of the farm and the personal property kept thereon, largely directed the disposition of the property while his mother was alive, and dictated the course that should be pursued with reference thereto. This was largely because he had charge of the farm, and had conducted the business from the time he was old enough to look after such matters. There is no evidence whatever tending to show that he had anything to do with the execution of the will, or that he had any knowledge thereof until some time after it was made. The duty of the trial court in such cases is well understood, and we are of opinion that there was no error in directing the verdict." (*Furlong v. Carraher*, 108 Iowa, 492, 494, 79 N. W. 277, 278.)

"The testator, and proponent, who is the principal devisee and legatee of the will, were partners for many years prior and up to the time of the decease of the former, and it is claimed on behalf of contestant that that *per se* raises a presumption of undue influence. We know of no case in which it has been so held. It is doubtless a circumstance to be considered with other facts and circumstances, when determining the question

whether or not undue influence was brought to bear upon the testator. We think the suspicion of undue influence having been exerted would be much stronger in a case where a testator should give all his property to a stranger than in one where he gives it all to one with whom he was intimately connected socially and in business for a great many years immediately preceding his death." (*Estate of Brooks*, 54 Cal. 471, 474.)

It is not necessary in this case to state at length the law upon the subject of unnatural wills. The right to make a will includes the right to make it according to the testator's own desires, subject only to the statutory restrictions. Unequal provisions in themselves raise no presumption of undue influence. They may be considered with other evidence in determining the question, Is this the testator's will? But they do not shift the burden of proof, and in the absence of proof that undue influence has been exercised they have no weight.

"The right to make a will is the right to make it according to the testator's pleasure—judiciously or capriciously—justly or unjustly—at absolute discretion, subject only to the restraints upon the power of disposition which the law has imposed. If the will is the expression of the testator's wishes lawfully made, the opinions of other persons, however they may condemn its motives or disapprove its scheme, can not, in any way, rightfully control his power to do with his own as he pleases, without impairing one of the incidents which give to every man's property its value. The claims of wife and children, like those of friends and dependents, are, by the law, left to the protection of natural feelings only; any or all of them may be disinherited by will, save only the wife's dower, and certain shares which, by statute, are guarded against excessive preference for a mistress or illegitimate progeny. When a deserving and affectionate child has been left destitute, and wealth has been heaped upon another, that, by unworthy means, gained the favour of a wrong-headed parent, the consolation of those who administer the law is that a right is preserved which is valuable, however liable it may be to occasional abuse, and that under it rewards may, in other cases, be bestowed according to merit. What is meritorious

in the eyes of one man is hateful in another—each, in giving his own, must be allowed to judge for himself.

"In the question of admitting a paper to probate as a will the provisions made by the paper are unimportant, if it appears to be a will—that is, a testamentary paper properly executed by a person of sufficient capacity, exercising volition. If the paper has these requisites, no matter how it may disappoint just expectations, how unequal it may be, how it may depart from previous intimations of purpose, it is the testator's will, and the law allows it to prevail. Great mistakes would probably be committed by any one who should undertake to decide from previous acquaintance with the aged father of a large family how he would desire his property to be divided after his death. The modes of thinking in different men as to the relative claims of widow, sons, daughters and grandchildren, and as to the relative values of various kinds of property, are so opposite; the circumstances of children are often so diverse as to family, connections, property, habits and success, that apart from differences in character, manners and conduct in the several claimants, and from feelings likely to be concealed in the bosom of the father, allowance would have to be made for many considerations besides equal affection for all, and the special advancements which had been made to each. . . . In examining questions of undue influence concerning a will, as in questions of capacity, the contents of the paper and previous indications of purpose made by the supposed testator may, as evidence, be brought into the investigation; but they can come in only as evidence pertinent to the inquiry, Is this his will? and should not be suffered to minister to any prejudice opposed to the license of testamentary disposition which the law allows. It is no condition of this license that the provisions of a will should be such as to please a jury. If the paper was properly executed, and the testator was of competent sanity, and no undue influence has been established, it is the testator's will, and no tribunal is appointed on earth to inquire whether it ought to have been his will. For a jury to proceed to that inquiry, or (which is the same thing) to decide against a will because they do not like its provisions, is a fraud upon the law, a violation of their sworn duty, and an usurpation which would never be tolerated if it

were not concealed." (*Means v. Means,* 5 Strob. [S. C.] 167, 191, 192.)

A case-note in 6 L. R. A., n. s., 202, collates the authorities on the relation of unnatural testamentary dispositions to the question of undue influence.

In the case of *Earl of Sefton and another v. Hopwood,* 1 Fost. & Fin. (Eng. 1855) 578, Cresswell, J., charged the jury in part as follows:

"He must have what old lawyers have called 'a disposing mind'; he must be able to dispose of his property with understanding and reason. That does not mean that he should make what other people may think a sensible will, or a reasonable will, or a kind will, because, by the law of this country, a man has absolute dominion over his own property, and if he, being in possession of his faculties, thinks fit to make a capricious will, a harsh will, or cruel will, you have no right to set it aside on that ground, for that would be interfering with the liberty which the law gives him; that would be to make his will for him and not to allow him to make his will." (Page 580.)

Applying the foregoing rules to the facts of the present case it is clear the demurrer to the evidence was properly sustained. There is no evidence of the fact, and nothing from which a jury might legitimately infer, that Fred Ginter concerned himself in the slightest degree in the matter of the disposition of his father's estate by will. There is nothing to show that he ever suggested to any one that his father make a will; that he ever advised his father to make a will, or discussed with his father the propriety or advisability of making a will; that he had any knowledge or even intimation that his father contemplated making a will; that he participated in any respect in the preparation or execution of the will; or that he knew a will had been made until after his father's death. John alone of the two brothers seems to have cast his frugal eye beyond his father's grave.

The general influence which Fred possessed over his father had been gained by their living together in the

same family and home, working together in the same fields, and sharing each other's burdens and prosperity. The confidence reposed in him was the natural and legitimate result of his conduct during the years he had been intimately associated with his father. But there is no suspicion even that he used his influence to procure the will, much less that he abused his opportunity, overpowered his father's mental integrity and coerced him against his judgment and desires into making an unwilling will which substantially disinherited John.

John had gone so far as to challenge the giving away of his father's property while his father lived, because of the possible effect on his inheritance. Fred's hot-tempered report of the conversation to his father merely warranted an inference derogatory to John's character which could not have been drawn had John's meaning been interpreted as he claims it should have been. There is no indication whatever of a subtle attempt to coerce the execution of a will by poisoning the testator's mind to such an extent that he could not freely make his own estimate of claims upon his bounty. The father had unrestricted liberty to ascertain the facts, and he did talk with his daughter, who was an unprejudiced witness, about the quarrel. Whatever view he finally took of the matter he was not subjugated into taking because he was held *in vinculis*. The same is true of the report that John was drinking. The father did not rely upon the information received from Fred, but, being entirely free from improper domination, he instituted an independent investigation of the truth of the charge and reached his own conclusion.

The mental soundness and capacity of Louis Ginter are unimpeached. Incompetency to manage his affairs is not suggested. No bodily weakness or infirmity affecting the free and clear operation of his mind is disclosed. So far as the evidence shows, without prompting from any source, without consultation with or advice from any person, he voluntarily went alone to the

witnesses who attested it and there freely and deliberately made his will. The witnesses appear to be unrelated to him, and their characters are unassailed. He was a perfectly free agent. From the multitude of considerations which doubtless pressed upon his judgment he formed his own estimate of what he ought to do with his property, and his will is his own will and not that of another.

The will is a perfectly natural will. The estate devised consists of an undivided interest in a partnership. Deducting one-half the amount of the mortgage from the inventory valuation, John's share would be $245. According to his own estimate it would be $320. He is disfavored but little more than his three sisters. The property is of a kind and is so situated that it can not be summarily reduced to cash and distributed as if it were merchandise. To do so would deprive the widow and Fred and his family of a home. Their portions are burdened with a mortgage of $1100. Who can say that the old man's plan to leave all the property to the widow and Fred and allow Fred ample time to work out a small sum to be paid in cash to other children is not reasonable and just, leaving out of account the legal right of the testator to do whatever may please himself? It is plain without argument that the burden was not cast upon Fred Ginter to prove want of undue influence.

The judgment of the district court is affirmed.