No. 24,434.

FRANK MARSHALL et al., *Appellees,* v. CLARENCE MARSHALL et al., *Appellants,* FLOYD MARSHALL, a minor, *Appellee.*

#### SYLLABUS BY THE COURT.

ACTION TO SET ASIDE WILL—*No Evidence of Undue Influence.* The proceedings in an action to set aside a will considered, and *held,* there was no evidence to sustain the finding that execution of the will was procured by undue influence.

Appeal from Jackson district court; MARTIN A. BENDER, judge. Opinion filed May 12, 1923. Reversed.

*Thomas A. Fairchild, E. D. Woodburn,* both of Holton, and *Oscar Raines,* of Topeka, for the appellants.

*E. R. Sloan,* of Holton, and *A. E. Crane,* of Topeka, for the appellees.

The opinion of the court was delivered by

BURCH, J.: The action was one to set aside a will. The court found the will was the product of undue influence, and rendered judgment accordingly. The defendants appeal.

John A. Marshall died intestate on March 29, 1910. He left a widow, Ruth E. Marshall, whose will is the subject of controversy. He left the following children: Frank Marshall, Rhoda Dye, and Myrtle Shellenberger, who are plaintiffs, and Clarence Marshall, Virgil Marshall, Charles Marshall, Joseph Marshall, and Jessie Oliver, who are defendants. He also left a son Julian, who died in February, 1919, and four grandchildren, the children of a deceased son, Logan Marshall. Ruth E. Marshall received, as her portion of

her deceased husband's estate, the home place, consisting of 160 acres of land, and a tract containing 16 acres. She continued to reside on the home place until April, 1912, when she went to live with Julian, who was unmarried. Her daughter, Jessie, then unmarried, lived with her on the home place, and went with her to Julian's. They resided with Julian until his death. Frank Marshall was appointed administrator of his father's estate. He was thirty-three years old, unmarried, and had remained at home. About nine months after his father's death he married, and moved into a tenant house on the home place. Clarence asked him to move back and take care of his mother and Jessie, and he did so.

Frank took care of his mother's business until she went to Julian's. After that Clarence transacted her business for her. After his father's death, Frank rented the home place. He gave a share of the crop until 1913, when he rented for cash. He testified the crop rent did not go to his mother, but went into the estate. The lease for cash was negotiated with his mother and Clarence together, both of them doing the talking. The check to pay the rent for 1913 was dated May 19. The amount of the check was $350, it was indorsed in the handwriting of Clarence, "R. E. Marshall, C. Marshall," and was paid on May 23. The will in controversy was executed six days afterward. Frank testified his mother kept an account with the State Bank of Holton. He said he gave the check to her, at Oliver's. He said he did not know whether she was then attending to her own business or not. Clarence testified as follows:

"Q. Did your mother often use checks herself? A. Hardly ever.

"Q. How would she get money when she wanted it? A. She would tell me what she wanted, and I went to the bank and signed her name and took her the cash."

The foregoing contains a statement of all the evidence relating to the connection of Clarence with his mother's business before the will was made. The subject is important because, as a prop for its finding that the will was the product of undue influence exercised by Clarence, the court stated the following strange finding of fact:

"In the year 1912, the defendant, Clarence Marshall, took possession of the moneys and properties of Ruth E. Marshall, and from that time on until her death, transacted all her business, she being required to ask for money when needed, and submitted thereto."

Frank received his share of his father's estate. He wanted $3,300 more, as compensation for remaining on the farm after he

became of age. His brothers and sisters objected. Finally they consented he should have $2,300. He made claim against the estate for that sum, it was allowed, and was paid in August, 1911. About that time Clarence succeeded Frank as administrator of his father's estate.

Clarence lived three-quarters of a mile or a mile from Julian's farm. At no time after his father's death did Clarence's mother and sister live with him, and there is no testimony relating to frequency of visits between them. Frank testified that, after his mother went to live with Julian, he visited her from time to time. He said she had pretty good health, never had much sickness, and he testified in unqualified terms that she had a strong mind and a good memory. He said she had a mind of her own, did not allow her children to overrule her, and there was nothing wrong with her mind.

On May 29, 1913, Ruth E. Marshall, Jessie, and Clarence, met in Holton, and went to the office of Charles Hayden, an attorney at law, where the will was prepared, signed, and witnessed. Mrs. Marshall and Jessie left Julian's the day before, stayed over night at the home of Charles, and then went to Holton. Jessie testified they met Clarence and went to Hayden's office without previous appointment. She is charged with exercising undue influence over her mother in the making of the will, and her testimony may be ignored.

Charles Hayden was a prominent attorney of this state, whose ability and high character were widely known and appreciated. He was Frank Marshall's attorney as administrator, and as an individual. He was attorney for Clarence as administrator, and was, in fact, the family attorney for settlement of the Marshall estate. He had in his office a clerk and stenographer, S. T. Osterhold, who witnessed the will. At the trial the will was shown to Osterhold, and he testified as follows:

"I remember that Mrs. Marshall and Charles Hayden retired to the back room; I was called to take the dictation of this will; I do not think any one was in the back room with them; as I remember it, I took the dictation in that back room; I drew the will in accordance with his dictation; do not remember that any preparation was made for this will before Mrs. Marshall and Hayden retired to the back room; the will was signed by her in the back room, in the presence of myself and John Q. Meyers; my opinion is no one was present except the four of us, Mrs. Marshall, Hayden, and the two witnesses. I know Clarence Marshall; know a good many of them by sight; I knew them at that time, same as I do now; do not remember seeing Clarence Marshall; as to saying who she came with, I don't know."

Jessie Oliver testified as follows:

"When we arrived at Hayden's office, we found there Mr. Hayden and Mr. Osterhold; they were in the front room in the office; the office had two rooms that I know of; mother spoke to Hayden when we entered the office. Mother said she came to see him in regard to making a will, that is about the way she spoke it. Mother and Hayden then went into another room; they closed the door; no one else went into that room; I did not see mother or Mr. Hayden again until they came back to where I was; when I first went in, Mr. Osterhold was in the room; I did not see the parties again until they came in where I was; I heard them call for John Q. Meyers; he came to the office and went into the room where Hayden and mother were; the door was closed after he went in; I could not hear what took place in that room; I was not at any time in that room where these people were; did not see them again until they came out of the room; I heard a conversation between mother and Mr. Hayden after they came out; mother spoke something to Mr. Hayden about leaving the paper in Mr. Hayden's care; she asked what she owed, and paid it."

If Jessie Oliver's testimony be ignored, there remains the testimony of Osterhold, and the following certificate attached to the will, signed by Osterhold and by John Q. Meyers, deceased at the time of the trial, relating to what occurred in Hayden's office:

"We, whose names are hereto subscribed, do hereby certify that Ruth E. Marshall, the above-named testator, subscribed her name to the foregoing instrument in our presence and in the presence of each of us, and at the same time she, the said Ruth E. Marshall, declared in our presence and hearing, and in the presence and hearing of each of us, that the foregoing instrument was her last will and testament, and requested us and each of us to sign our names hereto as witnesses to the execution of said will, and which we have done accordingly, in the sight and presence of said testator, Ruth E. Marshall, and in the sight and presence of each other, on the day and date of said will, to wit, this 29th day of May, A. D. 1913."

The will follows:

"In the name of God: Amen.

"I, Ruth E. Marshall, of Jackson county, Kansas, widow of John A. Marshall, late of said county and state, deceased, being of sound disposing mind and memory, do hereby make and publish this, my last will and testament, hereby revoking all former wills by me at any time or times made.

"Item One: I direct that all of my just debts, including funeral expenses and expenses of administration, be paid out of my estate.

"Item Two: I give and bequeath to my daughter, Jessie Marshall, the sum of five hundred dollars ($500), to be paid to her out of my estate, within one year after the date of my death.

"Item Three: I give and bequeath to my son, Frank Marshall, the sum of one hundred dollars ($100), to be paid to him out of my estate, within one year after the date of my death.

"Item Four: I give, devise and bequeath to my sons, Clarence Marshall, Julian Marshall, Virgil Marshall, Charles Marshall, and Joseph Marshall, and to my daughter, Jessie Marshall, all of the rest and residue of my estate, real as well as personal, and wherever the same may be situate; to have and to hold, unto them, the said Clarence Marshall, Julian Marshall, Virgil Marshall, Charles Marshall, Joseph Marshall, and Jessie Marshall, as tenants in common, share and share alike, and their heirs and assigns forever; subject, however, to the payment of all my just debts, including funeral expenses and expenses of administration, and also subject to the payment of each of the legacies specified in the second and third numbered items of this will.

"Item Five: The legacies specified in the second and third numbered items of this will are hereby made specific charges upon the property devised and bequeathed to my sons, Clarence Marshall, Julian Marshall, Virgil Marshall, Charles Marshall, and Joseph Marshall, and to my daughter, Jessie Marshall, by the fourth numbered item of this will.

"Item Six: I hereby nominate and appoint my son, Clarence Marshall, executor of this will.

"Item Seven: In making this will I have not forgotten either of my daughters, Myrtle Shellenberger and Rhoda Dye, nor have I forgotten either of the four sons of my deceased son, Logan Marshall, but for what seems to me to be good and sufficient reasons, I have not deemed it advisable to give, devise or bequeath to either of them, any part or portion of my estate.

"Item Eight: I do hereby expressly revoke all former wills by me at any time made, and especially my former will bearing date this 18th day of December, A. D. 1910.

"In Witness Whereof, I have hereunto subscribed my name in the presence of the attesting witnesses hereto, on this 29th day of May, A. D. 1913.

"Ruth E. Marshall."

After leaving Hayden's office, Mrs. Marshall and Jessie went to Frank's home, where they remained over Memorial Day. They arrived late in the evening. Mrs. Frank Marshall testified as follows:

"I asked why they were so late. She said they stopped in Holton on a little business, and she and Clarence and mother were at Hayden's office on some business. She did not say what the business was, or whether any of the other children were in Holton; said they telephoned Charley, but did not say whether he came or not. They stayed two or three days. The next day was Decoration Day, and we all went to the cemetery together. During the time they stayed there was nothing said about Mrs. Marshall making a will, neither by her or Jessie."

Frank Marshall testified as follows:

"I think I first found out that mother had made a will about three weeks after May 29, 1913, the date of the will I got the information from Clarence, at the home place. I was living there, and he came up there. He asked me if I knew mother had made a will, and I told him I did not; he said 'She made a will and cut out the children in the mountains and also Myrtle Shellen-

berger and Rhoda Dye, and when it came to you she would not cut you out; he told her she could leave me $100.'"

Frank further testified he made no complaint of the will to Clarence. He said he complained to Joe, and he talked to Charles about it.

Joseph Marshall testified Frank told him about the will either on Decoration Day or the day after, and testified further as follows:

"When I drove up Frank came out of the house; he wanted to know if I knew mother made a will; I said I did not; from what he said, part of the children, or maybe all of them, were here at Holton; said the children were to Holton and mother made a will; as near as I can remember, he said yesterday or the day before, and told me what was in the will; he said it was left to the six of us, Rhoda and Myrtle and the children in Colorado were left out, and he got $100. He said Jessie was to get $500 more than any of us; that is about all I remember that was said about the will at that time; I had another conversation with Frank about this will, at the home place, shortly after mother died; he said he would be willing to give the $2,300 back and share equally with the rest of the children."

Charles related the conversation between himself and Frank as follows:

"Myself and wife and Frank and wife were present. Frank wanted to know if I knew mother made a will. I said 'no.' He asked me if I knew anything about the will, said mother made a will, cut Rhoda and Myrtle and the children in the mountains out, and left him $100. He said, 'You boys allowed me $2,300, and I guess mother thought I was getting more than I was entitled to,' if I got an equal share.'"

There was evidence that Myrtle Shellenberger learned of the will in 1914. She did not testify at the trial. Rhoda Dye was a witness, but confined her testimony to facts occuring after Julian's death. When a young man, Virgil ran away from home. He lived in Colorado when the will was made, and until after Julian died.

Charles Hayden died in April, 1917, and his executrix notified Mrs. Marshall her will was among Hayden's papers, and would be delivered to her if she would call. She did not call for it, and it remained in the Hayden safe until after her death, on May 7, 1920.

The result of the foregoing is, the will was an accepted family fact, without intimation by anybody, from the time of its execution in May, 1913, until commencement of this action, that it had been wrung from the testatrix by compulsion and constraint.

At the first meeting between Clarence and Frank after the will was made, Clarence detailed the terms of the will, and there is nothing in his recital to show imposition upon his mother, in the sense the

law requires to constitute undue influence. Charles Marshall testified to a conference at the Shellenberger home, at which Frank's desire for an allowance of $2,300 out of his father's estate was discussed. Frank, Charles, Clarence, Julian, Jessie, and their mother, were present, and Frank expressed his willingness to accept present allowance of $2,300 as his entire portion of the estate derived from his father. There was testimony that he agreed his mother might make a will depriving him of any further share, but he denied committing himself to an agreement to that effect. Jessie was given a specific bequest of $500. When the will was made she was single, was living with her mother at Julian's, had poor health at times, and was under the doctor's care. There was evidence that Mrs. Marshall regarded Myrtle as a spendthrift, and considered it useless to give anything to her. There was evidence of estrangement between the senior Marshalls and the Dyes. There is no evidence showing the financial condition of the Dyes when the will was made. The grandchildren in Colorado had received some property from their father at his death, and their mother had remarried. Ignoring the foregoing evidence explaining the provisions of the will there is nothing in its terms to indicate it might not express the desires of the testatrix.

Frank Marshall testified that all the children except Charles objected to allowance of his claim for $2,300, and that his mother did most of the talking to them. The record is barren of any other subject of family disagreement previous to execution of the will, and for that matter, previous to Julian's death, six years later. There is no evidence Mrs. Marshall was vexed, or worried, or disturbed in her mind about anything, and there is no basis in the evidence for conjecture, even, that, as the court found, she made the will, either for the sake of peace, or for want of will power to write it differently.

Testifying in 1921, Frank Marshall said he did not know of a single thing either Clarence or Jessie did to influence their mother to make the will. No member of the family, or other person, was produced who testified to special or general tutoring of Mrs. Marshall's mind by Clarence or Jessie with respect to making a will, or any other subject, or to any kind of supremacy over her intellect or conduct before the will was executed. All the material evidence bearing on the testamentary act has been recited. It furnishes no

Marshall v. Marshall.

foundation on which to base legitimate inference, speculation, or sentimental guess, that this strong-minded woman was overmastered, that her free agency was destroyed, and that she was coerced to make the will against her wishes, through domination over her of Jessie and Clarence.

The law on the subject of undue influence in relation to wills has been declared in the case of *Ginter v. Ginter*, 79 Kan. 721, 101 Pac. 634, and subsequent cases. In this instance it was not applied, and the finding that the will in controversy was the product of undue influence is set aside.

The explanation for this litigation is disclosed by the record. Julian appears to have been thrifty. When he died, he left 200 acres of land, and considerable money and personal property. He left no will. His mother was his sole heir, and his property passed by her will.

After Julian's death, Virgil came home, bringing with him a wife and seven or eight children, and his mother established him on Julian's land. When Clarence undertook to lease part of the land, Virgil ran the tenant off with a shotgun. Virgil's mother desired to give him eighty acres of the Julian farm and, instead of being dominated by Clarence, the last year of Mrs. Marshall's life was embittered by controversy with him, in which he resorted to extreme measures to try to control her. She was still firm in her determination to have her own way, when her life was suddenly ended by pneumonia.

The judgment of the district court is reversed, and the cause is remanded with direction to enter judgment in favor of the defendants, and against the plaintiffs for costs.